ENNIS et al. v. BURNHAM et al., Appellants.

Division One, February 12, 1901.

1. **Setting Aside Deed:** PROVISION FOR LIFE: UNDUE INFLUENCE; FIDU-CIARY RELATION. The grantor was 78 years old, in very feeble health, living with his aged wife on their farm of 189 acres, the rent from which and the interest on $1,500 loaned, was sufficient for their support. He was afflicted with chronic diarrhoea, a kidney disease, and inflammation of the bladder which necessitated the drawing of his urine by mechanical means, which greatly debilitated him. Previously he had been remarkably active and sound-minded. Then "his eye had lost its lustre, and he had a stare." One physician testified that "his mental as well as physical weakness was apparent to one who knew him, without having to converse with him." "He could be easily influenced." He drooped, was silent, seemed to be in a deep study, when spoken to would hesitate long before he answered, and would then look wild out of his eyes, and his conversation was like a child's, and he little heeded what was going on around him. He suffered much. At the table, "he would take the meat dish up in his hands and pour the meat out of the dish on his plate, and then laugh like a real silly person." He failed to recognize his daughter after an absence of two weeks. He would wander away from the house, become lost, could not find his way back, and had to be hunted. A neighbor saw him out in the road bareheaded, and "he seemed to be wild." Often he was locked in his room at night. The deed was to his son-in-law and a daughter, for one dollar and "the further consideration of support during their natural lives." The probate judge who drew the deed said that he and the grantor were alone when the deed was drawn, and the grantor dictated its terms as he wrote; and that he was then very feeble in body, but he saw nothing wrong with his mental condition except a hesitancy in understanding the deed when it was read over to him. Twelve days later, it was acknowledged in the grantor's room by a county judge,

who said his mental condition was all right, and his wife's acknowledgment was taken in another room, and after the acknowledgments were taken the grantor asked him to say nothing about it as "his children would torment the life out of him if they knew it." He died about 15 months, and his wife a year, after the deed was made, which was recorded only a fortnight before his death. *Held*, that the relation of confidence and trust existed between the grantors and grantees, and the deed must be held to be the result of undue influence and illegal.

2. ———: DISTINCTION BETWEEN WILL AND DEED. The undue influence exercised in the making of a will is not a standard for testing that influence in the making of a contract between the living. In making the contract the mind and will-power of one party necessarily come in contact with those of the other, and may thereby be unduly influenced or entirely overcome.

Appeal from Howard Circuit Court.—*Hon. Jno. A. Hockaday*, Judge.

AFFIRMED.

*A. W. Walker* and *W. M. Williams* for appellants.

(1) The court erred in permitting plaintiffs to be asked this question: "State whether or not in your opinion your father was in a fit mental condition at any time for several years before he died to transact business." The capacity of the deceased to understand the transaction in which he was engaged is the test of his ability to make the deed. The standard of "fit mental condition" in the mind of the witness might be very different from the legal criterion. (2) There was a valuable and sufficient consideration for the deed. Defendants, by accepting it, undertook and bound themselves to support the grantor and wife during their joint lives, and the survivor during his or her life. The duties assumed were difficult and exacting. The place was

"a hard one to fill," as was said by defendant, Burnham. The obligations undertaken might have required years of careful nursing and attention to the old and infirm grantors. The adequacy of the consideration is not to be determined by subsequent events. The parties might have lived for years and required incessant and unremitting care. "Support of the grantor by the grantee is a sufficient consideration for a deed. The grantee by accepting the deed, and entering into possession under it, becomes bound by the agreement for the support of the grantor." 2 Devlin on Deeds (2 Ed.), sec. 807; Spalding v. Hallenback, 30 Bar. 392; Pennington v. Stanton, 125 Mo. 658; Taylor v. Crockett, 123 Mo. 300; Likins v. Likins, 122 Mo. 287; Hiatt v. Williams, 72 Mo. 214. The deed can not be set aside merely because the grantor afterwards changed his mind, or for any other reason became dissatisfied with it. It must be remembered "that this is a contract binding and obligatory upon the parties, and not subject to overthrow by mere caprice; otherwise it might be found to be very difficult for the aged and infirm, with moderate means, to make provision for their permanent support." Gupton v. Gupton, 47 Mo. 48; Studdard v. Wells, 120 Mo. 25. (3) Ephraim Snavely had sufficient capacity to make the deed if he was able to understand the nature and effect of the transaction in which he was engaged. The testimony of the witnesses for plaintiffs, as well as that on the part of the defendants, overwhelmingly proves that he was fully capable of understanding that he was making the deed and the consideration which he was to receive for the land. Cutler v. Zollinger, 117 Mo. 101; Richardson v. Smart, 152 Mo. 623; Taylor v. Crockett, 123 Mo. 300; McKissock v. Groom, 148 Mo. 459; Likins v. Likins, 122 Mo. 279. The contract was not an extraordinary one. The grantors needed nursing, care and attention, and, so far as then appeared, might need the same for years to come. They

had the property with which to procure all necessary comforts and suitable attention in their old age, and had the right to use it for that purpose. Very few, not bound to them by ties of blood, would have taken the positions. The arrangement was not an extraordinary one. The books show that such contracts are frequently upheld. Undue influence must be such as amounts to moral coercion. "It must be an influence exercised *mala fide* to produce a result which the party, as a reasonable person, was bound to know was unreasonable and unjust." McKissock v. Groom, 148 Mo. 459; Richardson v. Smart, 152 Mo. 623; Jackson v. Hardin, 83 Mo. 175.

*Sam C. Major* and *Crawley & Son* for respondents.

(1) Instead of a failure of proof, plaintiffs made a far stronger case than was required of them. When they had shown that at and before the making of the deed Ephraim Snavely was a sick and feeble old man, weak of body, impaired in memory, infirm in will; that Burnham and wife had moved to his farm for the purpose of taking care of him; and that while so having him under their care, inmates of the same house, they accepted from him a conveyance of all his land, constituting the greater part of his estate; plaintiffs might well have rested, without more. Because upon these facts the law condems the transaction; casting upon those who assert its validity the burden of proving, by the clearest, strongest, most convincing evidence, that said conveyance was supported by an adequate consideration; that its terms were fully and correctly understood by the grantor; that it was freely and voluntarily executed by him, after taking counsel of a disinterested adviser; without coercion, importunity, or deception, on the part of the grantees. Cadwallader v. West, 48 Mo. 483; Yosti v. Laughran, 49 Mo. 594; Street v. Goss, 62 Mo. 226; McClure

v. Lewis, 72 Mo. 314; Bogie v. Nolan, 96 Mo. 98; Kroenung
v. Goehri, 112 Mo. 641; Kirschner v. Kirschner, 113 Mo. 290;
Erhart v. Dietrich, 118 Mo. 430; Boggess v. Boggess, 127 Mo.
305; Martin v. Baker, 135 Mo. 495.    But plaintiffs have also
shown that Smith, the lawyer who drew the deed, advised the
old man about nothing the old man wanted to know, and wrote
nothing the old man wanted written.    That it was Smith who
suggested to Snavely, and not Snavely who suggested to Smith,
the making of the deed to Burnham.    That what the old man
asked to have prepared was a "writing" or "contract" between
himself and Burnham, binding Burnham to take care of him
and his wife, and binding the old man for his part to pay
Burnham for such service.    That Smith told the old man a
deed was necessary to accomplish this.    That even then
the old man hesitated, and that Smith had to read the
document twice over to him before the old man was prevailed
on to accept it.    That the one and only consideration which
induced the old man to enter into a contract with Burnham
and wife, to-wit, the prospect of receiving the care and attention
which his age and enfeebled condition demanded, was omitted
from the deed; while the very thing which Snavely already had
and Burnham stood most in need of, to-wit, support was
inserted in the deed, instead.    (2) The fact that the considera-
tion mentioned in the deed was false, and that the true consid-
eration, to-wit, care and attention from Burnham was entirely
omitted, is itself a badge of deception and fraud.    Caspari v.
Church, 82 Mo. 649.

BRACE, P. J.—This is an appeal by the defendants,
William B. Burnham and his wife Rhoda M. Burnham, from
a decree of the circuit court of Howard county, setting aside
and annulling a warranty deed executed by Ephraim Snavely
and his wife Julia F. Snavely, parties of the first part, dated

April 24, 1895, by them duly acknowledged on May 6, 1895, and filed for record on June 5, 1896, whereby said Snavely and wife conveyed to the said William B. and Rhoda Burnham, parties of the second part, a tract of land containing 189 acres, situate in Howard county and particularly described in the decree and petition, for the expressed consideration of "one dollar," and the further consideration "that the said W. B. Burnham and Rhoda Burnham his wife are to support the parties of the first part for and during their natural lives. In the event of the death of the said Ephriam Snavely or his wife, the said Burnham, if only one be living, or both if both be living, to support the survivor. The said Burnham and his wife are to have possession of the premises from this date, and the support therein referred to begins this day. And both possession and support go together up to the death of the said parties of the first part," *upon the ground,* as stated in the decree, "that said Ephraim Snavely at the time of the execution of said deed was an old and decrepit man, feeble in body and mind, and without sufficient mental capacity to fully comprehend the transaction in which he was then engaged; that said deed is not supported by a fair and adequate consideration, and that said deed was procured to be executed by the exercise of undue influence over said Ephraim Snavely by the grantees in said deed named."

It appears from the evidence that the said Ephraim Snavely died intestate on July 7, 1896; that he had been twice married; that the plaintiffs are his children, and the children of a deceased child, by his first wife, and the defendants are his children and the children of a deceased child, by his second wife. That for many years prior to April 24, 1895, the said Ephraim had been the owner in fee simple of the land described in the deed aforesaid of that date, and had occupied the same as a homestead on which he had reared his numerous

progeny, consisting of ten children, five by his first, and five by his second wife, all of whom, before that time, had grown up, married, and removed from the homestead, leaving him and his second wife, the said Julia, who was then an invalid and who died in the month of April, 1896, and their hired house-servant, the only occupants of the homestead. That at the time of the execution of said deed the said Snavely was about 78 years old, that he had some years before ceased farming the homestead, which was the only real estate he owned, and which was worth between six and eight thousand dollars, disposed of most of his stock and farming implements, and rented the land to tenants—the income from which source, and from some money, probably about $1,500 which he had out at interest, provided a sufficient support for himself and wife. That he was then, and for some years previous had been afflicted with chronic diarrhoea, a kidney disease and inflammation of the bladder that necessitated the drawing of his urine by mechanical means most of the time. These physical ailments grew worse as he grew older, and finally resulted in his death. The effect that they had produced upon his mind and body, at the time the deed in question was executed, is illustrated by the following extracts from the evidence collated by counsel for the respondents:

Mr. Evans, one of his neighbors, testifies:

"I had known Mr. Snavely ever since I was a boy, and that would date back to his manhood in middle life, I suppose; and at that time he was a stout, active man. But two or three years before his death he became infirm, feeble, and very much changed in appearance and capability from what he had been before. He was stooped in form, very much stooped. His shoulders and neck drooped; he tottered in his walk; and his eye had lost its brilliancy and lustre; and he had a stare—I called it. He would look at you—and his eye was not quick in its movement, as it had been before."

Concerning his mental condition, Dr. Hume says: "This old man's mind seemed to me, until the last few years of his life, remarkably active. But during the last few years of his life I think he was in his dotage. I think for the last three or four years of his life he was evidently in his dotage; and he was debilitated from those diseases, as a man of his age naturally would be, suffering from those diseases."

Dr. W. C. Harvey, who had known him for fifty years, testifies that up to four or five years before his death Mr. Snavely was a vigorous man; but that during the last three, four or five years his mind had become so much impaired through the diseases of his body; that his mental as well as physical weakness was apparent to one who knew him, without having to converse with him. This witness further considered that Mr. Snavely could be easily influenced during the last years of his life.

Mrs. Evans, a daughter of Mr. Snavely's first marriage, testified: "I noticed that in the latter part of his life he became very quiet, and seemed to be in a deep study all the time, and he didn't have but little to say. If anyone would speak to him, sometimes he would wait a second or so before he would answer, and he would look up just as wild out of his eyes. His conversation was just like a child. I noticed it about a year before his death, a little longer than a year—I guess it was two years before he died that I first noticed it. He didn't talk but very little. He didn't have very much to say; he seemed to be in a deep study pretty much all the time. He would sit still and say nothing and look down to the fire all the time. I noticed that in him so much. He paid no attention to what was going on around him when I was there. Sometimes he would sit in that mood as much as an hour and longer, at a time. Then he would get up and go and lie down on the bed. He was not like the same man at all."

Mrs. Hopper, another daughter, testifies: "He had been failing really for four or five years, very fast. He was a stout man, and when he commenced to fail in health he failed very rapidly; very fast, indeed; and he suffered terribly. He began to fail four or five years before he died. I could see the difference the different times I saw him; that he was failing." The witness then relates a number of incidents, beginning as early as 1894. At one time he would spend an hour in his stable on a hot day, painfully gathering up small wisps of hay from the ground to feed to a horse that already stood in easy reach of a large quantity. At another time—"he would sit down at the table with mother and me and the girls, and would take the meat dish up in his hands and pour all the meat out of the dish on his own plate, and then he would laugh like a real silly person." On yet another occasion, in 1895, after an absence of a couple of weeks, Mrs. Hopper went over to see her father and he did not recognize her.

Mrs. A. D. Simmons, a near neighbor, testifies to a habit of roving which Mr. Snavely acquired a year or two before his death. She says: "None of the children lived there, but they looked after him all the time. And whenever he was out of his seat they would look after him; and if he was not in sight they would ring the bell, and the neighbors would come and help hunt for him."

Mrs. Sarah Ennis, his eldest daughter, who since 1893 has resided in Nevada, Mo., and saw her father infrequently after that, testifies: "For some two or three years before he died he was a very feeble man. His mental condition was very feeble and childlike. He was old and childish. That is all I can say about him."

Captain S. B. Cunningham, an acquaintance for fifty years, after describing him as having once been a stout, able-bodied, resolute man, speaks of meeting Mr. Snavely in the

summer of 1895, near Mr. Snavely's house. The latter was out in the road, bareheaded, "and seemed to be wild . . . . . . . I spoke to him, as I always had done, but he didn't seem to recognize me, or, if he did, he didn't speak to me, but went right on. There was something about his eyes that told me he was not all right. What it was I do not know."

There was also evidence tending to prove a disposition on his part to slip off from home, to which at times he would not know how to return, and on account of which, as Burnham said, he "found it necessary to keep guard over him," and the old lady who occupied a separate room, locked him up at night.

While by this, and much other evidence, the feebleness, childishness, defective memory and mental weakness of the old man was shown, there was also much evidence tending to prove that they were not such as to render him incapable of comprehending and transacting his ordinary business, when his faculties were aroused, and concentrated on the subject.

His farm was distant from Fayette, the county seat, about eight miles. In the spring of 1895, his daughter Mrs. Evans, lived about three miles from the farm; his daughter Mrs. Hopper, about six miles, the Burnhams, about twelve miles; and the other children at greater distances. The relations between the old man and all his children seem to have been of the most friendly character. They visited him frequently, and ministered to his infirmities as occasion required. In the latter part of March of that year the appellants Mr. and Mrs. Burnham were on a visit to the old man and his wife, Mrs. Burnham's mother; when some arrangement was made by which they were to come and live with the old people, in pursuance of which the Burnhams, about the first of April, did move with their effects from the farm on which they had been living, to the premises, assumed control and ever since have been in possession thereof. The only evidence from which the character of

this arrangement may be deduced are the declarations of Mr. Burnham pending the removal, as to which Mrs. Hopper testified as follows:

"Q. What time was it that Mr. Burnham came over there for your husband to go up and stay with your father? Did you say it was about a week before Mr. Burnham moved over there? A. Yes, sir.

"Q. He had been staying there for a day or so himself, before that, had he? A. Yes, sir, for sometime; he would stay there awhile, and go back and forth between home and there.

"This conversation you speak of, did it take place in the presence and hearing of your husband? A. No, sir; only my daughter and myself were present and heard it.

"Q. What did he say when he first came there? A. He came up and spoke to us; then asked how we were getting on financially, and I said very well, I supposed. Then he said, 'I am busted financially,' and I said that was a very bad condition to be in, or something of that kind. Then he said, 'I don't see what I am going to do unless I outlive some old man and get his money.' Then he said, 'Your father has always been afraid to spend a nickle, but it has got to a point now where it will take money; he has always been afraid to spend a nickle, but it will take money now.' I said, 'I don't blame father for taking care of his money, for he worked hard for it, and I want him to have all the enjoyment he can have; and when it comes to saving his money, if he wants to do it, I want him to save it, if it makes him happier.' I said: 'I will go there and my son will go there. My son is 15 years old and he can go there and help father. He can occupy the room with father and wait on him.' My father and his wife didn't occupy the same room, and I said my son could go and occupy the room with him at night, and I would go and wait on him, and we could all take it turn about and wait on him.

"Q. What did Mr. Burnham say to that? A. He said a woman and a boy would not cut any figure in the case; that it would take a man to attend to things there; and that nobody but a man could do any good there."

*Mr. James R. Phelps* testified as follows:

"Q. Are you acquainted with W. B. Burnham, one of the defendants? A. Yes, sir.

"Q. Did you know Ephraim Snavely? A. Yes, sir; I knew him; but not very well.

"Q. Do you remember when Mr. Burnham moved to Ephraim Snavely's house? A. Yes, sir; I remember when he was moving. I saw him pass my house then.

"Q. State if you had any conversation with Mr. Burnham while he was moving his household effects to Ephraim Snavely's? A. Yes, sir; I did.

"Q. State what he said in that conversation? A. I was going to town one morning and Mr. Burnham was passing along with a load of corn, I think, and I asked him where he was moving, and he holloed to me and said: 'Come here to the fence; you are the very man I want to see.' Then he told me he was moving down to his father-in-law's. He said the old people were in bad health and his wife had been staying there for some time, as much as a week at a time, and he was at the home place, and the two places were a good ways apart, and that kind of life didn't suit him, to be there at home by himself; and he said the old folks were in bad health and he had concluded to go there and stay with him, 'and I want to know this: In case I go there and stay with them and they should die before we have an understanding, or agreement, will the court allow me well for my services.' I said: 'Yes, the court always allows a man good pay for such services; but the only trouble is that people generally put up too large a bill, and it has to be cut down; but the court will allow you well for

it.' I said: 'If I was in your place while they are living I would have some sort of agreement or understanding with them; as that would be better, and other people would understand what was coming to me.' I was in a hurry, and as I drove off I insisted on his making some sort of agreement or contract with them. I got the impression that he had made some sort of an agreement.

"Q. What did he say about it? A. He said he was going to try do it but didn't say that he had done it; but I told him that would be the best. It seems to me what he wanted with me was to know if the court would not allow him well for his services there in case they died without any arrangement with him."

And about the same time in a conversation with Dr. Harvey Burnham, he said "he considered it a very hard place to fill and he said he would have to be well paid for it."

On April 24, 1895, about twenty days after the Burnhams had become thoroughly installed in the old homestead, and had assumed control of its household, Mr. Burnham appeared with the old man at the office of Probate Judge J. T. Smith in Fayette, who testified on the trial as follows:

"Q. State if you drew the deed which I now hand you, dated April 24, 1895, purporting to be from Ephraim Snavely and wife to W. B. Burnham and Rhoda M. Burnham? A. Yes, sir; that is my writing.

"Q. That deed is written in blank form, is it? A. Yes, sir.

"Q. It is a warranty deed in blank form? A. Yes, sir.

"Q. Where was that deed written? A. In the court house, in the probate judge's office.

"Q. At your office in the court house? A. Yes, sir.

"Q. Was it written the day it is dated, April 24, 1895? A. I think it was.

"Q. What time in the day, if you remember, was that deed written? A. My best recollection is it was written in the forenoon of that day.

"Q. Do you remember whether it was a disagreeable, chilly day, or a warm, pleasant day, the day it was written? A. It was a little raw for the time of year, is my recollection.

"Q. Did you have a fire in your office? A. Yes, sir; in the grate; I don't recollect that there was a fire in the furnace and that the radiators were turned on.

"Q. Who procured this deed to be written? A. I suppose Ephraim Snavely did.

"Q. Who was present when it was written? A. Nobody but him and me. Mr. Burnham had come with him to the door and put his wraps down.

"Q. Just you and Ephraim Snavely were in your office at the time the deed was written? A. That is the way I remember it. Mr. Burnham said he had some business to transact in town, and by the time he got through he supposed I would be through with the writing.

"Q. Did Mr. Burnham come for Mr. Snavely that day? A. Yes, sir.

"Q. Do you know whether or not they came to town together that day? A. I don't.

"Q. They went away together in a wagon? A. My recollection is I saw them hitch their team to the rack, and they came to my office together.

"Q. Then Mr. Burnham laid the wraps down and said by the time you got through he would be there? A. He addressed his remarks to the old man and said: 'Probably by the time he got through he would be there.'

"Q. That he would come back when he got through? A. Yes, sir.

"Q. Then you and Ephraim Snavely were left alone? A. I don't think anybody else was in the room.

"Q. What did Ephraim Snavely then tell you he wanted you to write for him? A. He said he had come for me to do some writing, and I talked with him awhile, then said: 'I suppose you want me to write a deed, Mr. Snavely.'

"Q. What did he say at first? A. He said he wanted me to do some writing for him.

"Q. What did he say about it? A. He said he was too old and feeble to take care of himself and do his work, and he wanted to pay some one to do it for him. That is the idea I got from his conversation. I don't remember his words, and can not give them.

"Q. He wanted to employ some one to look after him? A. Yes, sir.

"Q. Up to the time you suggested the writing of a deed had he said anything about a deed? A. He said a writing, and I think I suggested the word 'deed' myself.

"Q. Please remember, if you can, what, before you said to him you supposed he wanted you to write a deed, as near as you can, exactly what Ephraim Snavely said to you that day? A. I can not remember the words he used, but what he said conveyed to my mind that he wanted a writing of that character.

"Q. Can you state any of the words he used? A. He said he wanted me to draw up a writing between him and Mr. Burnham, and gave me an idea of what he wanted.

"Q. What was that idea? A. That he was feeble and sick and not able to take care of himself and he wanted to pay Mr. Burnham to take care of him.

"Q. How much did he say he wanted to pay Mr. Burnham for taking care of him? A. He didn't say; he didn't speak of any money consideration at all, outside of what is in the deed.

"Q. Up to the time you suggested to him that he wanted

a deed written, what had he said about wanting to pay Mr. Burnham, if you remember? A. He said he wanted him to take care of him and his wife in their old age.

"Q. Up to the time you suggested the word 'deed,' what had he said about the terms of the writing he wanted you to draw up for him? A. I don't think he said anything more than was put in the body of the deed.

"Q. Up to the time you commenced writing the deed, and before you commenced writing it, what had he said about what he wanted to go in that paper? A. He said what I have just told you, only that and nothing more; that he wanted somebody to take care of him, as he was too feeble to take care of himself, and so was his wife, and he wanted to employ Mr. Burnham and his wife to take care of them.

"Q. Up to the time you suggested the word 'deed,' what had he said about how he desired to pay them? A. I can not recall anything he said outside of that paper.

"Q. Before you commenced writing the paper—there was not anything in the paper at that time, for you had not written it—up to that time, what had he said about how he desired to pay Mr. Burnham? A. There was very little time for an interview. He came in the office and I remarked that he was looking bad, too sick to be out, or something of that kind, and he said yes, that he wanted me to do some writing for him, and I went and got a blank and suggested that he probably wanted a deed written, and he dictated it and I wrote it down there.

"Q. What did he dictate? A. What is in the deed.

"Q. What is in it? A. I will have to speak from memory. That in consideration of the sum of one dollar and other considerations therein named, which were that Mr. Burnham and his wife should take care of Ephraim Snavely and his wife, in sickness and in health, and when one of them died they should take care of the other through the rest of his or her life.

"Q.   What else is expressed in the deed? A.   That is all I remember.

"Q.   What was to be paid for that? What was he to give them in return for that care? A.   There was no consideration at all, outside of what I have said, that he wanted them to take care of him.

"Q.   I asked what he said, not what is written here? A.   He said to me just what is embodied in the instrument of writing; I embodied it as near as I could, and read it over to him twice and asked him if it suited him, and he said it did.

"Q.   Before you wrote that instrument, had he stated to you the terms he desired to go in that paper? A.   Not specifically.

"Q.   You are the one who suggested the writing of a deed? A.   Yes, sir.

"Q.   He said he wanted you to draw up a writing? A. Yes, sir; and told me what he wanted in it, and I said a deed would be the proper paper.

"Q.   Then you drew up this instrument? A. Yes, sir; I read it to him twice, carefully.

"Q.   Did you give it to him? A.   Yes, sir.

"Q.   Why did you read it to him twice? A.   He hesitated, and I asked him if he understood the paper, and I read it again to him, and explained the description, etc.

"Q.   When did he hesitate? A.   He seemed to be in a study as to whether or not it suited him, and I read it again to him and asked him if it suited him.

"Q.   After you read it to him once, what made you think it necessary to read it to him the second time? A.   He was a sick and feeble old man, and it seemed to me that when I read it to him, he hesitated, and didn't give me an expression of his satisfaction, and I didn't know whether he fully understood it, and I read it again to him.

"Q.   He didn't ask you to read it the second time to him, did he?   A.   No, sir.

"Q.   What did he say?   A.   After the second reading, he said that was sufficient, or words to that effect.

"Q.   Do you remember the words he used?   A.   No, sir; but the substance of them was that that would do, I think.

"Q.   Do you remember any of the words he used?   A. I guess not more definitely than I have told you.

"Q.   From your acquaintance with Ephraim Snavely, and your observation and knowledge of him, and his condition at the time this instrument was written, state whether or not in your judgment Ephraim Snavely was, at that time, in any fit condition to transact business?   A.   I could not say directly as to that.   He was a very feeble old man, of course, and his mind was in sympathy with his body, but there was no evidence, so far as I could see, of mental derangement, but he was a weak, feeble man.

"Q.   State if it is a fact, or not, that you told him that day he was in no fit condition for the transaction of business? A.   I told him he was in no condition to be out that day, and that he ought to be at home, in bed; that was what I said to him.   It was a question of health, more than anything else, that I was talking to him about.   I told him he was risking his life by coming out a day like that, as feeble as he was.

"Q.   Do you say his mind was in a fit condition to transact business?   A.   I say he was in a very feeble condition of health.

"Q.   Do you say his mind was in a fit condition to transact business that day?   A.   Well, I don't hardly know.   I think that is a matter of opinion only.   He seemed to understand what I was trying to drive at, but he didn't convey to me very intelligently whether he wanted to make a gift to them of that property, or whether he wanted to convey a life estate, if they would take care of him.

"Q. Did you understand then, or do you understand now, what Ephraim Snavely desired to put in that deed? A. I don't understand the nature of the instrument. That instrument is what he dictated to me, or the meaning of it.

"Q. Did you understand then, or do you know, the kind of interest he intended to convey to Mr. Burnham in that land, from what he said to you then? A. No, sir!

"Q. And you were not able when you were writing the deed, to understand from him, what it was he really desired to have put in that paper? A. As to its legal import, I don't think I could.

"Q. How was it that you drew a warranty deed for him? A. He came to me to do some writing for him, and after talking with him I came to the conclusion from what he said, that a deed was the thing he wanted.

"Q. Though he had not said he wanted a deed? A. He had said he wanted a writing. He may have used the term contract.

"Q. Did he tell you, before you wrote this paper, that he wanted to make an absolute deed, in fee simple, to them? A. He didn't say absolute deed.

"Q. Did he say anything from which you could infer, legitimately, that he intended to convey to them an absolute deed in fee simple? A. My mind was not clear on that from the conversation.

"Q. It is not clear on that subject yet, is it, as to what he intended to convey? A. No, sir; it is not.

"Q. You can not state it from the deed itself, can you? A. No, sir.

"Q. You wrote that instrument with the view of having it express the matter as confusedly as the idea had been conveyed to you by him, didn't you? A. I wrote it just as he dictated it.

"Q. Did you tell him you could not understand it? A. No, sir!

"Q. After you had written the instrument what did you do with it? A. I handed it to Ephraim Snavely.

"Q. How long was he there before Mr. Burnham came and got him and took him home? A. He was there just a short time; I don't remember just how long.

"Q. You say you gave that deed to Ephraim Snavely that day? A. Yes, sir.

"Q. And that he and Mr. Burnham went home together? A. Yes, sir.

"Q. After that how long before you saw Ephraim Snavely again? A. I think it was from six weeks to two months after that before I saw him again.

"Q. It was that long before he came back to you? A. I think it was about that long.

"Q. When he came back then, what did he come for? A. He came in and I shook hands with him, and he remarked, before I said anything to him, that he was hunting the fool-killer and wanted that deed. I told him I expected it was in the recorder's office, that I had not seen nor heard of it since I gave it to him.

"Q. What did he say to that? What deed was it? A. It was the deed I drew and I told him I had given it to him and had never seen it since.

"Q. When you read this deed over to him, after writing it, state if you explained to him that the effect of that deed was to convey an absolute estate in this land to the grantee? A. I didn't."

The complexion of the evidence of this witness in chief, was not changed by the cross-examination.

The instrument thus prepared next appears, twelve days

Vol 159 mo—33

after, in the evidence of Frank Fugate, a county judge, who testified as follows:

"Q. Look at this paper, which I now hand you, being a deed dated April 24, 1895, from Ephraim Snavely and wife to W. B. Burnham and Rhoda Burnham, his wife, and state who took the acknowledgment of Ephraim Snavely and wife to that deed? A. I did. It was taken at Ephraim Snavely's house, pretty early on Monday morning, May 6. W. B. Burnham came for me to take it. No, sir; I did not go there with Mr. Burnham.

"Q. When did he come for you? A. He saw me in Armstrong on Saturday evening. I agreed to go on Monday and take the acknowledgment. When I got there Mr. Burnham met me in the door, and then I went in the room where Ephraim Snavely and his wife were. When I went in there, Mr. Snavely asked had I come to take the acknowledgment, and I said I had, and he said Mr. Burnham would get it, and Mr. Burnham brought it in and laid it on the table, and I picked it up and looked over it very carefully, enough to know what it was, then laid it back on the table, and the old man asked me if it was ready for him to sign, and I said yes, and he picked it up and asked me what line he must sign on, and I showed him, and I asked him if he did it of his own free will and accord, and he said he did. His wife signed it, too; I went in the other room where she was, and asked her if she knew what that paper was, and she said yes, it was a deed to the place there, and I asked her if it was her free will and she said yes. Ephraim Snavely was not in there when I asked her that. When I first got there Ephraim Snavely asked me if I had come to take the acknowledgments to that deed. He didn't say what deed.

"Q. Was he capable at that time of knowing what he was signing, or that he was signing, conveying his property? A. He was.

"Q. You think he knew what he was doing? A. Yes, sir; I didn't think anything else.

"Q. What was there, if anything, in his manner or otherwise to indicate that he didn't know or understand what he was doing at that time? A. There was nothing at all to indicate that; he seemed to understand what he was doing; I don't know that I am capable of judging, from my previous knowledge of him, what his mental condition was, at that time, but I thought it was good. I never had any other business transactions with Mr. Snavely. I had talked with him before that. Had seen nothing at all in his previous demeanor to indicate that he was not of sound mind."

On cross-examination, Mr. Fugate said:

"Q. Mr. Burnham came for you to go there and take those acknowledgments, did he? A. He didn't come for me. I met him in Armstrong and he asked me to come. He asked me if I could take an acknowledgment to a deed, and I told him yes, I guessed I could, and he said: 'The old man wants to see you.' And I said: 'What does he want to see me about?' And he said: 'He wants you to take an acknowledgment,' and I told him all right, I would come.

"Q. Aside from the conversation with Mr. Burnham you didn't know anything about what the old man wanted, did you? A. Only that, and what the old man said when I got there. I didn't know anything about what Ephraim Snavely wanted with me until I got there. When I went in Ephraim Snavely's room, nobody was there but him. Mr. Burnham went with me to the door. I knocked at the front door first, and Mr. Burnham came to the door, and invited me in the hall, to the door in Mr. Snavely's room, and he opened the door, and I went in, but he didn't come in, and I do not know where he went, but Mr. Snavely asked me if I had stopped by to take the acknowledgment of that deed, and I said yes, and he said

Mr. Burnham would get it. He didn't say what deed it was. Mr. Burnham brought it in. I never saw Ephraim Snavely with the deed, until Mr. Burnham brought it in there.

"Q. After Mr. Burnham brought the deed in there, was he present or not when the old man signed it? A. I think when he brought it in, he laid it on the table and went out, but I can not state that positively; I don't know whether he was in there when the old man signed it or not. Mrs. Burnham was not there. Mrs. Ephraim Snavely was not in the room where the old man was. After Mr. Burnham got the deed he laid it on the table. I didn't read the deed to the old man. He didn't read it in my presence before he signed it. He just signed it, that was all. The old lady told me that was a deed to the farm, and the old man didn't. He didn't tell me that he was making a deed to his farm to Mr. Burnham. After I took his acknowledgment, and went in the room she was in, she told me it was a deed to the farm there, when I asked her if she knew what she was signing. I didn't ask him if he knew what it was, for I took it for granted, by his asking me to stop and take his acknowledgment that he did. I assumed that he knew what it was. He didn't tell me what the instrument was he was signing, and I didn't tell him. He didn't read it in my presence, and I didn't read it to him. When I went in the room where the old lady was, and asked her about it, she told me it was a deed to Mr. Burnham to their farm there. Somebody asked me to say nothing about the deed at the time I took the acknowledgments. It was the old man. He asked me to say nothing about it. That was at the same time I took the acknowledgment. After she signed it I went back in the room where the old gentleman was, and while I was in there, he asked me not to say anything about it, and I asked his objection, and he told me."

On re-direct examination, he said:

"Q. What did he tell you about that? A. He said his other children would torment the life out of him if they knew it."

The instrument then disappears from view and so remains until brought to the recorder's office by Burnham and by him filed for record on June 5, 1896. In the meantime the old lady having died as before stated in April, 1896, and the old man having left the homestead in May, 1896, and gone to the home of one of his other children, on June 19, 1896, instituted a suit in the circuit court of Howard county against Burnham and wife to set aside and annul said deed upon the same grounds as in this case. Within eighteen days thereafter he died intestate July 7, 1896, as hereinbefore stated, and thereafter on some date not appearing in the record, this suit was instituted, to which all his living children, and the descendants of those dead, are parties, and to none of whom, had he, in his lifetime, ever given anything except a cow and a bed to each of his daughters on their marriage.

Thus it was, that this old man, weak in body and mind, with an income sufficient to support himself and his aged invalid wife, both of them then tottering on the edge of the grave, and desirous only of securing that care and attention which their infirmities required, in the brief span that intervened between their trembling footsteps and their final resting place, and for which the old man was willing to make compensation to his son-in-law, who seems to have volunteered the service, was led, first to surrender to him the possession and control of this valuable homestead, from which their support was mainly derived, and then to execute this deed conveying it to him in fee simple for the consideration of one dollar and the support which the homestead itself was mainly to afford. That the consideration for the deed was grossly inadequate, and the bargain a hard and unconscionable one is beyond ques-

tion. That the inadequacy of the consideration and the unfairness of the bargain must have been palpable to the healthy discerning eyes of the grantees can not be doubted. That the grantor did not comprehend and did not intend to execute a deed of the purport of this one, is fairly inferable from the evidence. That he was in a condition to be easily influenced, and the grantees in a position to exercise such influence is also beyond question, and that the deed was the product of such influence exercise by them, is the only rational explanation of all the facts and circumstances of the case. In view of the character of the contract and the relation of confidence and trust sustained by the grantees to the grantors therein, the influence which produced this deed must be held to be undue and illegal.

Counsel for appellant cites several will cases, in support of their contention that the mental weakness, and the influence operating thereon in this case, do not come up to the standard therein laid down for setting aside a will. But we are not dealing with a will. This is a case of contract *inter vivos*. As was well said in Martin v. Baker, 135 Mo. loc. cit. 504: "One may be capable of making a will, and yet incapable of making a contract. In making the latter his mind and will-power necessarily come in contact with that of the other contracting party, and may be unduly influenced or entirely overcome by it. A contract, therefore, by one of impaired mental and will-power with one standing in confidential relations with him should be closely scrutinized, to see that no improper advantages has been taken or undue influence exerted. The exertion of undue influence in such case may be pronounced from the nature of the contract and from an unreasonable and unfair advantage secured by it." And as was ruled in another case, Kirschner v. Kirschner, 113 Mo. loc. cit. 297, "Where one person has acquired over another a position of superior

influence or advantage by reason of relationship, trust or confidence (whatever its origin), and business dealings occur between such parties, the court will require proof of the former, that the dealing were fair and honest in all respects on his part under penalty of rescinding such dealings entirely."

These principles are now so well established in the equitable jurisprudence of the land that the citation of other cases is deemed unnecessary, and applying them to the facts of this case, we have no hesitation in sustaining the decree of the court below.    The judgment of the circuit court will therefore be affirmed.    All concur.