MARY E. COOK et al. v. WILLIAM HIGGINS,
Appellant.

In Banc, November 30, 1921.

1. **WILL: Intention: Family Secrets.** If not violative of some estab-
lished rule of law, the intention of the testator must be gathered
from the four corners of the will, and fully effectuated. And in
determining whether the will gave to testator's wife an absolute
estate or a life estate with power of disposition for her own sup-
port, with remainder over to his children to so much of the estate
as was not disposed of by her during her lifetime, the court will
enter the family circle and read the secrets of testator's heart as
his will discloses them.

2. ———: ———: **Absolute or Life Estate: Power of Disposition.** By
his will testator gave to his wife all his property, both real and
personal, "to have full control, to sell and dispose of it as she may
see fit, giving her the right to make deeds to all or any of the real
estate of which I may be possessed at the time of my death, and
after my wife's death whatever may remain unexpended I desire
to be divided" among a son and daughter and her children, giving
to the son one thousand dollars if that "amount of money is
left" and if "that much is not left then all money under that
amount is to be given to said son," and "after the above amount
is taken out of the estate the remainder left to be divided" equally
between his only daughter and her nine children. *Held*, that, in
construing the will the court will consider the fact that testator
and his wife lived alone on a farm of one hundred and fifty acres,
that his wife was paralyzed and unable to walk, that his only
son was an imbecile and his only daughter was married to an
invalid by whom she had nine children, and that mindful of the
unfortunate physical condition of his wife he undertook to pro-
vide for her declining years, and with these facts in mind it is
ruled that he clearly intended that the wife should have an estate
for life in both real and personal property, with power to sell
all or any part thereof, and with remainder over after her death
to the legatees named.

3. ———: **Life Estate: Power of Disposition: Gift or Devise.** Where
the will gave to testator's wife all his real and personal property,
with power to control, sell and dispose of it as she saw fit, "and
after my wife's death whatever may remain unexpended" was

Cook v. Higgins.

given to a son and a daughter and her children, thereby giving to the wife a life estate, with power to sell, and remainders over to the children, the wife was not given power to convey the property as a gift without consideration, but the power of disposition invested in her covered only sales or transfers for her personal uses, comfort and enjoyment, and did not include gifts by deed or will.

4. ———: ———: ———: Necessity: Unexhausted Personalty. Where the personal property of the estate is sufficient to comfortably support the widow, who by the will is given a life estate with power to dispose of the real estate, with remainder over, no sale of real estate is contemplated until the personalty is exhausted, and a sale by her prior thereto cannot be sustained. But by this is not meant that the life tenant should be in condition of immediate want, but in order to sustain a conveyance of the real estate it should appear that the raising of additional money had become reasonably necessary. So that where the will gave to testator's widow all his personal and real property, with power to sell and dispose of the same as she saw fit, and whatever remained at her death to his children, thereby giving to her a life estate, with power of disposition, with remainder over, a conveyance of the home place by the widow shortly before her death, at a time when she had nearly six thousand dollars in bank, as a gift to testator's nephew, who had bestowed on her no care or attention involving love and affection or ministrations which could not be hired, cannot be sustained as a proper execution of the power to sell. [Disapproving the majority opinion, and adopting the views of the minority on the point, in Griffin v. Nicholas, 224 Mo. 275.]

5. CONVEYANCE: To Tenant: Fiduciary Relation. Where the widow, who had been given power by her husband's will to sell and dispose of his real estate, had lost the use of her limbs at the age of forty-five years and twenty years before his death in 1912, and thereafter could not walk, but wheeled herself about in a wheel chair, and, her children being married and living elsewhere, entered into a contract with her husband's nephew by which he was to receive two-thirds and she one-third of all the crops that he might produce on the home place, and she was to board him and he was to do the chores about the house and farm, perform such duties as she was unable to perform, and generally look after her and the place, and there was established between him and her a relation of intimacy which enabled him, if so disposed, to influence her, he lived in the same house with her for three years, largely looked after her wants and attended to and assisted her in her business affairs, and because of her physical infirmity she was greatly dependent upon him in practically all things, which dependence in turn led her to rely upon him and to repose

confidence in him, and however disinterested his attentions and ministrations to her they served to give him a power over her possessed by no one else, a fiduciary relation existed between him and her, and the validity of a deed conveying to him the home place for the recited consideration of "one dollar and other valuable considerations" must be determined with such fiduciary relation in view.

6. ————: ————: ————: **Legal Presumption of Undue Influence.** A fiduciary relation between grantor and grantee having been established, the presumption of law follows that the deed was the result of undue influence exercised by the grantee, and the burden is upon him to show that such influence was not exercised. And in deciding the question the court will consider the fact that the grantor was physically infirm, that her suffering from pain was intense, and her resultant weakened mentality about the time the deed was made.

7. ————: **Facts Showing Undue Influence.** A feeble woman seventy-five years of age, paralyzed in her limbs for thirty years, was dependent upon her husband's nephew, who was young and vigorous, for care and attention; they had lived under the same roof for over three years in close relationship; her mind and will, by reason of her age and long and painful suffering, were unequal to his; fearful of having no one to care for her, she deeded to him her farm, worth from $7,500 to $9,000, upon condition that he live with her, and keep and care for her during the few remaining years of her life, which condition was the only consideration for the deed, and was not performed; he had continuously urged her to convey the place to him, threatening to abandon it and her unless she did so; there was testimony that she had previously expressed the intention of deeding him the property if he remained with her and continued to do as well by her as he had done, and that the deed was voluntarily executed as a reward for his good treatment of her in the past and his agreement to care for her in the future; but on the other hand it is undisputed that he had himself carried her to the office of the attorney who drew the deed, and that she at that time had nearly $6,000 in bank, which was sufficient to support her for several years; that he subsequently received about $4,000 of this money as a gift; and that by these operations he received practically all the estate left by the will of her husband, and the remaindermen, to whom was given by the will what remained of the estate at her death, were cut out. *Held,* that the deed was procured, either directly or indirectly, by the undue influence of the grantee.

8. **WITNESS: Competency: One Party Dead.** In a suit to set aside a deed conveying land to defendant, on the ground that it was the

result of undue influence exercised by defendant upon the grantor and was without consideration, the defendant, the grantor being dead, is not competent to testify concerning any matters or things occurring prior to the appointment of the administrator of her estate. [Distinguishing Griffin v. Nicholas, 224 Mo. 1. c. 288.]

Appeal from Jasper Circuit Court.—*Hon. Joseph D. Perkins,* Judge.

AFFIRMED.

*J. H.* and *W. E. Bailey* and *Grover C. James* for appellant; *Dewey & Foulke* of counsel.

(1)   Under the will the widow took an absolute fee simple estate in all real estate owned by testator at the time of his death. Small v. Field, 102 Mo. 104; Roth v. Rauschenbusch, 173 Mo. 582; Tisdale v. Prather, 210 Mo. 402; Cornet v. Cornet, 248 Mo. 184; Lemp v. Lemp, 264 Mo. 533; Middleton v. Dudding, 183 S. W. 443; Huntington Realty Co. v. Megaree, 217 S. W. 301. "Where there is a general devise without any specification of the interest devised, and an absolute power of disposal is conferred by the will, the devisee takes the fee and may dispose of the estate at his or her pleasure." Green v. Sutton, 50 Mo. 186; Tisdale v. Prather, 210 Mo. 410. (2)   If the will is construed as giving Harriett Brown a life estate in the real estate "to have full control, to sell and dispose of it as she may see fit, giving her the right to make deeds to all or any of the real estate," and not limiting her to the power to dispose of it "for her comfort and support," she was authorized to sell or dispose of the real estate for any purpose whatever within her discretion. There was no restriction placed upon the manner, mode or object for which she might dispose of the property. Priest v. McFarland, 262 Mo. 236; Dunbar v. Sims, 222 S. W. 839. (3)   Assuming that under the will the widow took only a life estate in the real estate with power to sell and dispose of the same "for her comfort and support," as alleged in plaintiff's petition,

under the facts in this case, her physical ·condition and needs' considered, she properly executed the power in making the deed in controversy. Hazel v. Hagan, 47 Mo. 277; Griffin v. Nicholas, 224 Mo. 302, 310; Priest v. Mc-Farland, 262 Mo. 235; Ricketts v. Peoples Bank, 196 S. W. 26; Dunbar v. Sims, 222 S. W. 838. (4) The consideration in the deed from Harriett Brown to defendant is both valuable and adequate. Cutts v. Young, 147 Mo. 587; Anderson v. Gaines, 156 Mo. 664; Studybaker v. Cofield, 159 Mo. 616; Griffin v. Nicholas, 224 Mo. 310; Lee v. Lee, 258 Mo. 614; Ellis v. McNally, 177 S. W. 659; Bennett v. Ward, 199 S. W. 946; Wells v. Kuhn, 221 S. W. 20. (5) The evidence in this case does not show a fiduciary relationship existing between the grantor and grantee at the time or prior to the execution of the deed in controversy. Therefore, the burden of establishing the fact of undue influence exercised over grantor rests on those attacking the deed, the plaintiffs, and is not shifted to the defendant. Moreover the evidence overwhelmingly shows that there was no undue influence exercised by the grantee or anyone else in obtaining the deed. Studybaker v. Cofield, 159 Mo. 614; Griffin v. Nicholas, 224 Mo. 292; Lee v. Lee, 258 Mo. 613; McFarland v. Brown, 193 S. W. 800; Bennett v. Ward, 199 S. W. 945; Sinnett v. Sinnett, 201 S. W. 887; Wells v. Kuhn, 221 S. W. 19; Hamlet v. McMillin, 223 S. W. 1069. (6) The plaintiffs had the burden of proof as to the want of mental capacity of Harriett Brown to execute the deed in controversy. Chadwell v. Reed, 198 Mo. 379; McFarland v. Brown, 193 S. W. 804. The greater weight of the evidence conclusively shows that the grantor undoubtedly had sufficient mental capacity to make the deed. Cutts v. Young, 147 Mo. 587; Lee v. Lee, 258 Mo. 611, 612; Ellis v. McNally, 177 S. W. 654; McFarland v. Brown, 193 S. W. 800; Hahn v. Hammerstein, 198 S. W. 833; Bennett v. Ward, 199 S. W. 947; Sinnett v. Sinnett, 201 S. W. 887; Messer v. Heefer, 212 S. W. 897; Wigginton v. Burns, 216 S. W. 756; Hamlet v. McMillin, 223 S. W. 1069. (7) The court erred in ruling that the defendant could only testify

as to transactions occurring subsequent to the appointment of an administrator on the estate of Harriett Brown, deceased, and also erred in refusing to permit defendant to testify in rebuttal of evidence admitted through plaintiffs' witnesses concerning alleged matters of inducement leading up to the execution of the deed. Griffin v. Nicholas, 224 Mo. 288.

*Phil. Callery, F. B. Wheeler* and *Howard Gray* for respondents.

(1)    Under the will the widow took a life estate with power to sell and dispose of it, with the remainder to the children and grandchildren named in the will. Harbison v. James, 90 Mo. 411; McMillan v. Farrow, 141 Mo. 55; Gibson v. Gibson, 239 Mo. 490; Burnett v. Burnett, 244 Mo. 491; Trigg v. Trigg, 192 S. W. 1011; Walton v. Drumtra, 152 Mo. 489.    (2)    The appellant's second point is that even though the court should find that Mrs. Brown only took a life estate under her husband's will, as she was given the power to sell and dispose of the property, she could do so in any way she saw fit, even to giving it away and it was nobody's business.    This is not the law in this State.    Garland v. Smith, 164 Mo. 1; Tallent v. Fitzpatrick, 253 Mo. 10; Underwood v. Cave, 176 Mo. 1.    (3)    In answering appellant's fourth point we agree with his attorneys in so much of the statement therein that declares the principle, that, if Harriett Brown took a life estate with the power to sell and dispose of the property, she had a right, if acting in good faith and without undue influence being exercised, to sell and convey the property.    The authorities cited by appellant under that point go no further.    But so much of the statement that declares that under the facts and law Mrs. Brown's physical condition and needs were such at the time she executed the deed that it was properly executed, we deny.    The only case cited by the appellant that discusses this question is Griffin v. Nicholas, decided by this court, four judges concurring and three

dissenting, and we submit with confidence that, change the facts in the Griffin case to correspond with the facts in this case, and the dissenting opinion would have had the unanimous endorsement of all the members of the court. (4) Whether the court finds that under the will the widow took a life estate or an absolute fee, the judgment was for the right party in any event. The only reason for discussing the character of the estate she held is to show that when she made her deed she labored under the idea that she was sole legatee because she so states in her deed, and furthermore if she only had a life estate, then in making the conveyance, the question of good faith toward the remaindermen heretofore discussed in this brief becomes material. Was there a confidential relation between Mrs. Brown and the appellant? Jones v. Belshe, 238 Mo. 524; Smith v. Williams, 221 S. W. 360; Byrne v. Byrne, 250 Mo. 632; McClure v. Lewis, 72 Mo. 314; Mowry v. Norman, 204 Mo. 173; Ennis v. Burnham, 159 Mo. 494; Street v. Gross, 62 Mo. 226; Cornet v. Cornet, 248 Mo. 234; Price v. Meade, 207 S. W. 695; McNatt v. McNatt, 93 Atl. 367; Johnston v. Stonestreet, 66 S. W. 621. (5) The confidential relation having been established, the burden is upon the defendant to satisfy the court by the clearest evidence, not only that no advantage was taken of the old lady, but that the contract was fair, equitable and for an adequate consideration. Street v. Goss, 62 Mo. 226; McClure v. Lewis, 72 Mo. 314; Ennis v. Burnham, 159 Mo. 494; Mowry v. Norman, 204 Mo. 173; Smith v. Williams, 221 S. W. 360; Sittig v. Kersting, 223 S. W. 742; Kincer v. Kincer, 246 Mo. 437; Gay v. Gillian, 92 Mo. 263; Cornet v. Cornet, 248 Mo. 234; Gross v. Courtley, 170 S. W. 600; Brown v. Slaton, 189 S. W. 1130; Kelley v. Fields, 181 S. W. 657; Price v. Meade, 207 S. W. 695; Noban v. Shoup, 137 N. W. 77; Adams v. Luce, 170 N. Y. Supp. 172. (6) In determining this question the court must also take into consideration the fact that the conract is between the principal and his agent or stranger instead of a parent and child. McKissock v. Groom, 148 Mo.

459; Jones v. Belshe, 238 Mo. 543. (7) The testimony shows that Mrs. Brown had other children and that one of them was incapable of supporting himself on account of unsound mind, and that she was on the friendliest terms with him, and that he visited her almost daily. The fact that she cut him out in deeding her property to the defendant is a strong evidence of the undue influence. Gay v. Gillian, 92 Mo. 251; Price v. Meade, 207 S. W. 695; Gross v. Courtley, 170 S. W. 600; Kelley v. Fields, 181 S. W. 659; Adams v. Luce, 170 N. Y. Supp. 172; Noban v. Shoup, 137 N. W. 75. (8) Inadequacy of consideration where the parties are not on equal terms is a badge of fraud. Brown v. Slaton, 189 S. W. 1130; Ennis v. Burnham, 159 Mo. 494; Dowell v. Edwards, 161 S. W. 534; Mott v. Mott, 22 Atl. 997. (9) There was no reason for making the deed as the old lady's income was sufficient to meet her every demand. Kelley v. Fields, 181 S. W. 659; Wash v. Harky, 69 Atl. 726; Allen v. Levand, 107 N. E. 570; McNatt v. McNatt, 93 Atl. 367.

ELDER, J.—This is a suit in equity to set aside a deed to 150 acres of land in Jasper County, Missouri, executed by Harriett Brown, now deceased, to William Higgins, defendant, appellant herein, and seeking to have title to said land vested in plaintiffs, respondents herein. The bill, which was not challenged, alleges in part that the deed was procured by appellant while Harriett Brown was "aged and infirm and unable to take care of herself in business transactions and unable to transact ordinary business affairs, and at a time when she was easily influenced and at a time when defendant was living with her and was her manager and agent, . . . without consideration and at a time when he knew that she had but a few days to live." The answer admitted the execution of the deed, but denied all other allegations contained in the bill.

The land in question, valued at between $7,500 and $9,000, was owned by one Richard Brown, who, with his wife, the said Harriett Brown, had lived on the same as

their home place for many years. Richard Brown died testate in Jasper County, Missouri, on August 29, 1912, leaving surviving him his wife and two children, a son, James Brown, an epileptic and imbecile, who was married and lived on a farm near by, and a daughter, Mary Elizabeth Cook, who with her invalid husband and nine children lived across the state line in Kansas, nine miles from the Richard Brown place. James Brown, the son, died in November, 1917. Three of the children of Mary Elizabeth Cook died before the trial of the suit. William Higgins, the appellant, is about thirty-six years of age, is a nephew of Richard Brown, and had lived on the Brown farm with Harriett Brown, as a tenant, from about a year after her husband's death up until the time of her demise. Harriett Brown, the widow of Richard Brown, had lost the use of her lower limbs at the age of about forty-five years, or twenty years before her husband's death, and thereafter could not walk, but wheeled herself about in a wheel chair. The terms of appellant's rental from Mrs. Brown were that he was to receive two-thirds of all crops that he might raise upon the place, and Mrs. Brown one-third; that Mrs. Brown was to board him, that he was to do the chores about the house and farm, perform such duties as Mrs. Brown was unable to perform, and generally look after her and the place. The uncontroverted testimony shows that when appellant entered into this arrangement he had practically nothing, but that during the time he remained with Mrs. Brown he acquired a threshing machine, which he operated through the surrounding country, and a saw mill; that Mrs. Brown furnished the provisions for the home; that she paid for the family washing, including the clothes of appellant; and that when a nurse was needed she paid her. While Mrs. Brown was able to wheel her chair around the place, do much of the housework, and cook the meals, appellant at times assisted her in these thing. The evidence tends to show that during appellant's ten-ancy on the Brown farm he looked after Mrs. Brown's

business affairs, waited upon her, and attended to those things about the place which she was unable to do. It also discloses that during the latter part of his tenancy he grew somewhat neglectful of her, remained away from the farm for days and nights at a time, compelling her to secure help to look after the stock, and that during the last three years, in threshing season, he was away much of the time with his threshing machine, doing threshing for others.

From December, 1916, on, Mrs. Brown suffered severe pain in her head and spine almost continuously. There was testimony to the effect that by reason of her suffering, her mind became weakened and that she was unfit to transact business. This was controverted by the testimony of other witnesses. There was also testimony to the effect that she complained that appellant was endeavoring to secure a deed to her place. To offset this there was evidence adduced on behalf of appellant to the effect that she had expressed the intention that if appellant continued to take care of her as he had been doing she would deed the farm to him.

On January 9, 1917, Mrs. Brown was taken by appellant to the office of an attorney at Carthage, Missouri, who drew the deed conveying the Brown farm to appellant. The deed is an ordinary warranty deed, containing a covenant of general warranty, made by "Harriett Brown (widow and sole devisee under the last will of Richard Brown, deceased)," with a recited consideration of "one dollar and other valuable considerations," and containing the following reservation:

"The said party of the first part hereby reserves unto herself all the rents and profits derived from said farm for and during her natural life, and it is made incumbent upon said party of the second part to live with the said party of the first part, upon said farm, and to keep and care for her for and during her natural life, and if at any time the said party of the second part fails and refuses to live with the said party of the first part and

care for her, upon said farm, then the title hereby conveyed to said party of the second part will revert to the said party of the first part.''

About March 10, 1917, Mrs. Brown was taken. to a hospital in Pittsburg, Kansas, and, on March 7th, before going, she endorsed and delivered to appellant a certificate of deposit for $5,974.53, previously issued to her by the First National Bank of Pittsburg, Kansas. The appellant took this certificate to the bank at Pittsburg and left it there for safekeeping. After remaining at the hospital for about a week Mrs. Brown was brought back to the farm, where she died on April 2, 1917, she being then over seventy-five years of age. The Probate Court of Jasper County, Missouri, placed her estate in the hands of the public administrator of that county, who, on April 7th, went to Pittsburg, Kansas, and demanded of the bank there the money represented by the above mentioned certificate of deposit. The banker, after consulting with appellant, notified the public administrator. that they held no funds belonging to Mrs. Brown. On this same day, however, appellant withdrew the $5,974.53 represented by the certificate of deposit from the bank and gave the public administrator $2,000 in cash, saying that he did so pursuant to the request of Mrs. Brown made at the time she delivered the certificate to him on March 7, 1917. Appellant further told the administrator that $1,000 of the $2,000 given him was for the guardian of James Brown, the imbecile son of Richard and Harriett Brown, that being the amount of a legacy bequeathed him under the will of Richard Brown, and that the remaining $1,000 was to go into the estate of Harriett Brown. The balance of $3,974.53 was retained by appellant.

The testimony further shows that during the latter part of the year 1915 Mrs. Brown purchased an Overland automobile, costing $900, which appears to have been claimed by appellant after her death.

In addition to the land in controversy, the evidence tends to show that Richard Brown died possessed of

about $7,000 in cash, some farm machinery and a few horses and cows.

The respondents herein are Mary Elizabeth Cook, daughter of Harriett and Richard Brown, and six of her children, named as residuary legatees in the will of Richard Brown. The trial court found that the deed in question was obtained by appellant while he was living with Harriett Brown, ''at a time when he was looking after her business affiairs and assisting in taking care of her, and at a time when she was feeble, and without any adequate consideration and through the undue influence of the said defendant.'' Pursuant to this finding the court below entered a decree for respondents, setting aside the deed to William Higgins and vesting title in respondents to the land conveyed thereby. From this judgment and decree defendant appeals.

In addition to the facts above set forth, the material testimony adduced by the parties in support of their respective contentions will be referred to and set out in the opinion in discussing the questions presented for review.

I. The first point made for appellant is that under the will of Richard Brown, his widow, Harriett Brown, took an absolute fee simple estate in all real estate owned by the testator at the time of his death, while respondents contended that she took a life estate with power to sell and dispose of the same, with remainder to the children and grandchildren named in the will. The learned counsel for both appellant and respondents stress this phase of the case and have briefed their respective contentions in a manner indicating assiduous research. We are constrained to believe, however, that the construction of the will of Richard Brown is but incidental to the real issues in the case, which are more largely questions relating to the alleged fiduciary relationship existing between Mrs. Brown and appellant and the undue influence said to have been exercised by him. But, as the intention of Richard Brown, as gathered from his will, is primarily decisive

*Will: Life Estate: Power to Sell.*

of the character of estate given Mrs. Brown, and as the other questions involved are somewhat dependent upon the nature of that estate, we shall pass to a consideration of the provisions of the said will. It reads as follows:

"I, Richard Brown of Jasper County, Missouri, being of sound mind and memory do make, publish and declare this to be my last will and testament to-wit: first of all my funeral and just debts to be paid. Second, I give, devise and bequeath to my beloved wife, Harriett Brown, all of my property both personal and real estate to have full control, to sell and dispose of it as she may see fit giving her the right to make deeds to all or any of the real estate that I may be possessed of at my death and after my wife's death, whatever as may remain unexpended I do desire to be divided as follows:

"First, I give to my son, James Brown $1000.00 in money if there is that amount of money left; if not that much left then all money under that amount to be given to said son. And after the above amount has been taken out of the estate, the remainder left to be divided equal share and share alike between my daughter, Mary Elizabeth Cook and her children, Walter Cook, Oscar Cook, Henry Cook, Ola Cook, Irl Cook, Lula Cook, McKinley Cook, Teddy Cook and Frank Cook, deducting from Oscar Cook's amount $250.00 dollars. He having already received that amount from the estate.

"My son, James Brown, being of unsound mind, I appoint Walter Cook, as his guardian to look after the property left to him from my estate to be used only for his benefit alone and if any money left at the death of said James Brown, to be divided equal between my daughter, Mary Elizabeth Cook and her children as named hereinbefore. I hereby constitute and appoint my said wife, Harriett Brown to be the executrix of this, my last will and testament revoking all former wills by me made.

"In Witness whereof, I have hereunto set my hand and seal this 13th day of Sept., A. D. 1909.

"(Seal)　　　　　·　　　　　Richard Brown."

As is well settled, if not violative of some established rule of law, the intention of the testator must be gathered from the four corners of the instrument, and fully effectuated.   [Grace v. Perry, 197 Mo. 1. c. 559; Brooks v. Brooks, 187 Mo. 476; Cross v. Hoch, 149 Mo. 325; R. S. 1919, sec. 555.]   As was said by MARSHALL, J., in Cross v. Hoch, 149 Mo. 1. c. 338, 339: "We must seek admittance into the family circle and learn the relations and feelings of the testator towards each of the beneficiaries of his bounty.   We must read the secrets of his heart as his last will discloses them."   Applying this rule to the facts disclosed by the record, coupled with the language used in the will before us, we find Richard Brown and Harriett Brown at the time the will was made, living alone on the farm in controversy, their two children having married and having families of their own.   Harriett Brown, the wife, was paralyzed and unable to walk. James Brown, the son, was an imbecile.   Mary Elizabeth Cook, the daughter, had an invalid husband and nine children.   Mindful of the unfortunate physical condition of his wife, Richard Brown undertook to so provide for her that she might be fully cared for in her declining years.   His first consideration was for her, and to the end of amply providing for her he gave her full control of his estate, both real and personal, with power to sell the real estate and execute deeds thereto.   Having thus made provision for her, he next remembered his unfortunate son, James, appointed a guardian for him and bequeathed him $1,000 out of such sum as might remain unused by the wife.   Not forgetful of his daughter, he made provision for her and her nine children by bequeathing them whatever remained over and above the legacy given James.   In all the will is a natural one, such as any man would ordinarily make under similar circumstances.   It breathes the spirit of righteousness.   But that the testator only intended to create a life interest in the wife, with power of disposition, is manifest from the concluding sentence of the first paragraph, which reads: "and after

my wife's death, whatever as may remain unexpended I do desire to be divided as follows." While the life estate is not expressly declared, by implication from the devises over and the objects of the will, it must be deduced. Accordingly, an examination of the phraseology of the entire will, as well as a careful consideration of the authorities cited by both appellant and respondents, leads us to conclude that Richard Brown clearly intended that his wife should have an estate for life in both his real and personal property, with power to sell all or any part thereof, and with a remainder over at her death to the legatees named in the will. We predicate this conclusion upon the analogous case of Guthrie v. Crews, 286 Mo. 438, and authorities therein cited. And from the adjudicated cases we are equally convinced that such intent and purpose transgresses no rule of law.

II. Appellant's second contention is that even though Mrs. Brown took only a life estate under her husband's will, she was authorized to sell or dispose of the real estate for any purpose within her discretion, without restriction as to the manner, mode or object of such disposition. To sustain this contention appellant cites Priest v. McFarland, 262 Mo. 1. c. 236, and Dunbar v. Sims, 222 S. W. 1. c. 839. The Priest case is to be distinguished from the case at bar in this, to-wit: In that case the evidence tended to show that two children of the deceased, who were grantees under a deed made by the widow, with the reservation of a life estate, had paid a consideration of $6,000 in cash, had accounted to their mother for rents accruing from the property and had provided her with support and maintenance until her death, while in this case the expressed consideration for the deed under consideration was "one dollar and other valuable considerations," with no showing of any further consideration outside of the agreement of appellant to keep and care for Harriett Brown, which was not proven to have been

*Power to Give or Devise.*

carried out. And, to offset the latter consideration, the evidence is uncontroverted that appellant was supported by Mrs. Brown and received from her approximately $4,000 in cash, in' addition to a favorable contract of tenancy. The Priest case was decided *en banc*, by a divided opinion of four to three, with BROWN, J., who concurred in the result, stating: ''I am, however, convinced that the widow was not authorized by the will *to give away the land of the testator*'' (Italics ours), which would seem to be the practical result in the instant case, were the deed to defendant to be sustained. The case of Dunbar v. Sims, supra, is not in point.

To concur in appellant's view, it would be necessary. to construe the will as giving Mrs. Brown the power of absolute and unlimited conveyance by sale, *gift, testamentary disposition, or other method of transfer*, or, in effect, an absolute estate in fee simple, which we have just said was not the intention of the testator. This is not our conception of the purpose and object of the testator or of the law applicable to the case. In Tallent v. Fitzpatrick, 253 Mo. 10, where the will of the deceased created a life estate in the testator's wife and a remainder in his children, ''with full power'' in her·''to sell at any time any or all of my real estate and convey the same by good and lawful deeds of conveyance at any time she may think best, and to her best interest,'' the widow executed deeds to each of two of the children, with a recited consideration of $1,000. The evidence showed that no part of the consideration was paid, but did show that the daughter, one of the grantees, rendered care and assistance to her mother while she lived and surrendered a $300 note executed to her husband by her father; the evidence also showed, as to the son, the other grantee, that after his father's death he gave his mother $200 and paid the father's funeral expenses and medical bills, as well as having rendered him some financial assistance during his lifetime. A judgment annulling the two deeds was affirmed by this court upon the ground that the power

of sale given the wife did not authorize her to give the property to one or more of her children, to the exclusion of the others, nor to convey the same in satisfaction of some vague, uncertain and unprobated claims against the father's estate. BOND, J., in construing the will, said, on pages 16 and 18, that "the life tenant was restricted to a sale and conveyance in pursuance thereof in the proper and legal sense of the term, and she had no power to defeat the remainders by any other form of alienation. . . . It is evident that these transactions did not in any fair and just sense meet the requirements of a sale of the property which the widow was authorized to make under the will."

In another case where the devising clause read, "I give, devise and bequeath the residue of my estate to my said sister Sarah and it is my desire that whatever of said residue may be left undisposed of at her death shall go to her descendants *per stirpes*. In the event that I survive my said sister Sarah, I give, devise and bequeath said residue of my estate to her children," etc., the court said: "We think from the terms of the will, the relationship of the parties, and in accordance with the foregoing principles of law, the testatrix by that instrument gave a *life estate to her sister with full power to dispose of the property for her use, comfort or enjoyment, or any other purpose incident to these ends, but with no power to give it or will it away;* for if these powers had been donated, the life estate would have been transformed into an absolute estate and the plain purpose of the testatrix to give the property left at the expiration of the life estate to the persons named in the devise over would have been set at naught." (Italics ours). [Burnet v. Burnet, 244 Mo. 491, l. c. 506.]

In another case under a deed conveying land to a trustee for the sole and separate use and benefit of the grantor's wife for and during her natural life, with power in the wife "to sell, mortgage, encumber, lease or otherwise dispose of the same to such persons and for

such uses and purposes as she may at any time by writing by her signed, direct and appoint," it was held that the power of appointment given the wife did not create in her power to *give* the land away during her life, either to her foster son by deed or to any other person or in any way, nor did the words "or otherwise dispose of" enlarge the power of appointment so as to include a gift of the property. [Garland v. Smith, 164 Mo. 1.]

Upon authority of the principles to be extracted from these cases, when considered in conjunction with the relationship of the parties and their condition in life, we hold that the power of disposition given Mrs. Brown covered only sales or transfers for her personal uses, comfort and enjoyment and did not include gifts by deed or will. This construction harmonizes with the evident intention of Richard Brown and at the same time preserves and subserves the rights of the remaindermen named in the will. To hold as appellant urges would transform the life estate of Mrs. Brown into an absolute estate in fee, thereby defeating the intention of the testator and the limitations over.

III. Appellant next contends that even though Harriett Brown took only an estate for life, with power to sell and dispose of the same for her comfort and support, under the facts in the case, her physical

Existing Necessity to Sell.

condition and needs considered, she properly executed the power in making the deed in controversy. To sustain this point appellant cites several cases, among them, Priest v. McFarland, 262 Mo. l. c. 235, which has hereinbefore been distinguished from the case at bar. Hazel v. Hagan, 47 Mo. 277, and Dunbar v. Sims, 222 S. W. 838, also cited, are beside the issue. Ricketts v. People's Bank, 196 S. W. 26, is distinguishable, as in that case neither the questions of fiduciary relationship or undue influence, nor any question of physical condition or need was involved. This leaves for consideration only the case of Griffin v. Nicholas, 224 Mo. 275, l. c. 302, 310, relied upon by ap-

pellant. While there is some similarity of facts in that case with the one under review, nevertheless, there is the distinction that there no undue influence was shown to have been exerted in obtaining the deed in question, and no confidential relation existed between the parties, as appears here. Moreover, the undisputed evidence here shows that Mrs. Brown, at the time of her death, had on hand, represented by a certificate of deposit, the sum of $5,974.53 in cash, an amount ordinarily sufficient to have comfortably supported and maintained her, including the hire of a nurse or servant to minister to her. Appellant, who was not even a blood relative, was not shown to have any particular fondness for her, or any aptitude or training for nursing, and it cannot therefore be argued, as was in the Griffin case, that the care and attention which he bestowed upon her was of a character or kind involving the elements of love and affection, or ministrations which could not be hired.

The Griffin case, supra, was a decision *en banc*, by a divided opinion of four to three. A dissenting opinion was delivered by LAMM, J., l. c. 312 *et seq.*, in which WOODSON, and GRAVES, JJ., concurred. The clause of the will there which is pertinent to the particular question now under consideration provided: "I give and bequeath all the balance and residue of my estate to my wife, Rosanna Burlingame, to have and to hold and enjoy for and during her natural life, with *full power to make such disposition thereof as may be necessary for her comfort and support.*" (Italic ours.) The majority opinion of the court, per VALLIANT, C. J., held that the power to sell rested in the discretion of Mrs. Burlingame, the court saying on that point, l. c. 309, 310: "We do not mean to say that if she was recklessly or fraudulently wasting the estate the court could not interpose to restrain her, but until a showing is made to justify the chancellor in laying his hands on her the disposal of the property is in her discretion." *Contra,* the minority opinion held that the power to sell hinged upon the *necessity* of a conveyance for Mrs.

Burlingame's comfort and support, such power being based upon whether a sale was *reasonably necessary*. In considering that feature, LAMM, J., said at pages 336, 338: "In some cases the intent of the testator, gathered from his language, puts the right of decision solely in the widow and she is given directly or by implication uncontrolled judgment and discretion. But the use of such language in this will is industriously avoided and testator left the power of disposition to hinge upon the existence of a fact, *viz.*, the *necessity* for her own comfort and support, not that she might deem it so or want it so for by-ends. . . . The comfort and support mentioned did not mean fanciful conceits, whims or extravagances. The words import a reference to her needs and manner of living. Whether the contingency actually happened which would uphold the conveyance, became, therefore, a matter of judicial determination upon the evidence. That evidence has been set forth at such length as to preclude any necessity of repetition, and we onnounce our conclusion to be that the contingency did not happen, *ergo,* the deed cannot stand. . . . We do not hold that under her husband's will the widow was compelled to go into court for power to sell. . . . She had power to sell under the will. But her power was coupled with a limitation and must be based on the existence of a fact, *to-wit,* that the sale was reasonably necessary for her comfort and support. We find the fact to the contrary." With the minority view as above set forth we agree, and, in that particular, we think the majority opinion in Griffin v. Nicholas, supra, should be disapproved. Accordingly, applying to the instant case the principle which seems to us to be the correct one, we are constrained to hold, upon all the evidence in the case, the financial status and physical condition and needs of Harriett Brown considered, that a conveyance to appellant of the land in question was not reasonably necessary for the comfort and support of Mrs. Brown, a limitation which was by implication coupled with the power of sale given her, and the deed in issue should not be

upheld on that ground.   [Scheidt v. Crecelius, 94 Mo. 322; Hull v. Culver, 34 Conn. 403.]

It seems to us that the doctrine which should be applicable under the particular conditions here is: That where the personal property of the estate is sufficient to comfortably support the widow, who by will is given a life estate with power to dispose of real estate, and with a remainder over, no sale of the real estate is contemplated until the personalty is exhausted, and a conveyance thereof by her prior thereto cannot be supported. By this we do not mean that the life tenants should be in a condition of immediate want, but it should appear that the raising of additional money had become reasonably necessary.   And as giving countenance to this doctrine we find authority in Hull v. Culver, 34 Conn. 403; Morford v. Dieffenbacker, 54 Mich. 593; Parks' Admr. v. Missionary Society, 62 Vt. 19, and Minot v. Prescott, 14 Mass. 496.

IV.   It is next contended by appellant that there was no fiduciary relationship existing between him and Mrs. Brown at the time of or prior to the execution of the deed in controversy, as argued by respondents, and that there was no undue influence exercised in obtaining the deed, as charged by respondents.   These questions seems to us to transcend in importance practically all others presented in the comprehensive briefs of counsel and a proper consideration thereof calls for a review of the evidence in the case bearing thereon.

The testimony shows that appellant lived in the house with Mrs. Brown, assisted her in various ways as has been hereinbefore mentioned, waited upon her at times at night, aided her in transacting her business at the bank at Asbury, Missouri, made out her checks, took her to town frequently and assisted her in selling poultry, butter, eggs, etc., and looked after the work on the farm. The entire evidence tends to show that she relied largely upon appellant to take care of her and had confidence in him.

From the latter part of 1916 up until the time of her death Mrs. Brown suffered much pain and gradually became more feeble. In December, 1916, being ill, she employed Miss Amy E. Currey, a nurse, who remained with her about a month. Miss Currey testified on behalf of respondents, that Mrs. Brown suffered constant pain, so much so that her mind "wasn't strong;" that she frequently talked of ending her life because of the pain; that she told her that appellant come to her (Mrs. Brown) poor, but that "after he got fixed up he neglected and didn't care for me;" that Mrs. Brown on several ocassions stated that appellant contracted personal debts which she had to pay; that while she was at the Brown home appellant was gone the greater part of the time and that Mrs. Brown complained of being left alone, especially at night; that frequently appellant and Mrs. Brown would go into another room, appellant closing the door, and hold a conversation, after which Mrs. Brown would tell her (Miss Currey) that appellant was after her to deed him her home, Mrs. Brown saying, "I will not do it. He is constantly after me to do it and he will leave me unless I sign this deed over;" that more than once appellant said to her (Miss Currey) that "Auntie" (referring to Mrs. Brown) "has promised to deed her place to me and if she don't sign up I will not stay;" and that appellant objected to the children of Mary Elizabeth Cook, the daughter, coming to visit Mrs. Brown and to her giving James Brown, the son, any money.

Dr. Coleman, a physician who visted Mrs. Brown professionally on January 30, 1916, November 3, 1916, January 16, 1917, and March 20, 1917, testified, for respondents, that in January, 1916, "owing to the long siege she had had with this paralytic condition" he did not consider Mrs. Brown "capable of transacting any business;" that when he called on her on January 17, 1917, he condition "was very bad," that she was in constant misery with pain in her back and spine, that it was necessary to "give her something so she might

have rest day or night,'' that her mental condition was ''very bad'' and that he did not then consider her ''capable of transacting any business at all.''

Mrs. James Brown, widow of the epileptic son hereinbefore mentioned, testified that she had visited Harriett Brown ''most every day'' since Richard Brown had died, remaining all day at times; that Mrs. Brown began to decline in health about the middle of December, 1916; that there were ''days she didn't know anything;'' that she had seen her ''when she was in such agony she didn't know who she was;'' that ''one minute she would say she would do so and so, and the next minute do something else.''

Ola and Oscar Cook, daughter and son of Mary Elizabeth Cook, and two of the plaintiffs herein, testified that in November and December, 1916, and in January, 1917, they had each separately visited Mrs. Brown, their grandmother, at which times she was suffering much pain in her back and head, that she was in constant misery and was at times ''out of her head.''

Five witnesses, who had either worked on the Brown farm or had visited at the home, testified for appellant to the effect that Mrs. Brown's mental condition was good and that she seemed capable of taking care of her affairs. Dr. Barson, who called on her once at her home ''the latter part of 1916'' and for about a week in the hospital at Webb City ''the first part of 1917,'' testified that her physical condition was poor, but that her mental condition ''seemed all right'' and that as far as he could see ''she was perfectly rational.''

A stipulation between counsel as to the testimony which Dr. Herbert Smith, who was at the time of the trial in the service of the United States Government at Ft. Riley, Kansas, would have given if present, showed that he visited Mrs. Brown daily at the hospital at Pittsburg, Kansas, from March 10, 1917, to March 19, 1917, during which time she was ''normal and alert mentally and fully understood everything that was transpiring,'' but that beginning with March 19th her physical condi-

tion grew worse and she "began to show signs of delirium and gradually declined physically and mentally thereafter until her death."

Mrs. Ida Kendall, a cousin of Mrs. Brown, testified for appellant that some time after appellant Higgins had come to live with Mrs. Brown, he (Higgins) had brought Mrs. Brown to visit her, at which time Mrs. Brown, in the course of conversation, had said that "if Mr. Higgins stayed with her and done as well as he had done, he would get the farm." A statement to similar effect was also testified to by Minis Kendall, husband of Ida Kendall, by Mrs. Thoda Hunt, who lived three-fourths of a mile from the Brown place and frequently visited Mrs. Brown, and by Harve Smith, who worked for appellant on the Brown farm. The record does not disclose, with any degree of accuracy, just when these statements were made to the several parties testifying thereto.

With respect to the execution of the deed to appellant the evidence shows that on January 9, 1917, appellant carried Mrs. Brown up to the law office of Mr. J. H. Bailey, an attorney, at Carthage, Missouri, and at that time and place Mr. Bailey drew the deed and read it to her, as she could neither read nor write. The consideration recited in the deed, as has been said, was "one dollar and other valuable considerations." There was no showing that after the execution of the deed appellant did anything towards keeping or caring for Mrs. Brown, as was contemplated by the clause making it incumbent upon him to do so to maintain the validity and binding effect of the deed. As far as the record discloses the relations of the parties remained the same as before the deed was made. Guy Wells and W. H. Miller, who were called in by Mr. Bailey to witness the deed, both testified that in their opinion Mrs. Brown seemed capable of looking after her affairs.

While the foregoing evidence shows a sharp conflict as to the condition of Mrs. Brown's mind in the latter part of 1916 and the Spring of 1917, there remain certain

outstanding facts which are not controverted, to-wit: That she was old and feeble, and from December, 1916, on, was in very bad health, suffering severe pain; that she had even spoken of taking her own life because of her suffering; that she lived in the same house with appellant and depended much upon him to look after her welfare and affairs; and that appellant carried her into the office of the attorney to have the deed to him drawn and executed.

As has been held, it is the duty of this court, in an equity case, to weigh the evidence and reach its own conclusion, after giving due consideration and deference to the conclusion reached by the trial chancellor. [McFarland v. Brown, 193 S. W. 800; Givens v. Ott, 222 Mo. 395; Cohron v. Polk, 252 Mo. l. c. 281.]

(a) In considering the question as to whether or not a fiduciary relationship existed between appellant and Mrs. Brown, we have examined all of the authorities cited by learned counsel for appellant and find, with one exception, that the grantee in the deed attacked was a son, a daughter, a brother, a sister, or some other blood relative of the grantor, and that the conveyance was made out of affection in return for the faithful and loving performance of kind and dutiful attentions. It was never intended that services of that character should be penalized and it is only when these "natural sentiments have been prostrated to unnatural and selfish ends that the law interposes to protect the victim." [Sinnett v. Sinnett, 201 S. W. l. c. 889.] But in the present inquiry, appellant was no blood relative and the services performed by him were more in the nature of the fulfillment of a contractual obligation which he had incurred in becoming a tenant of Mrs. Brown. There was, however, established between him and Mrs. Brown a relation of intimacy which enabled him, if so disposed, to influence her. He lived in the same house with her, largely looked after her wants and attended to or assisted her in her business affairs. However disinterested his attentions

and ministrations may have been, they served to give him a power over Mrs. Brown possessed by no one else. Furthermore, in view of her physical infirmity she was greatly dependent upon him in practically all things, which dependency in turn led her to rely upon him and repose confidence in him. We are accordingly of the opinion, and so hold, that a fiduciary relation did exist between appellant and Mrs. Brown. [Ennis v. Burnham, 159 Mo. 494; Martin v. Baker, 135 Mo. 495; McClure v. Lewis, 72 Mo. 314; Ryan v. Ryan, 174 Mo. 279; Mowry v. Kettering, 204 Mo. 173; Byrne v. Byrne, 250 Mo.- 632.]

(b) A fiduciary relation being established, the presumption of law follows, under the conditions here present, that the deed to appellant was the result of undue influence exercised by him, and the burden de-

**Undue Influence.** volved upon him to show that such influence was not exercised. [Cornet v. Cornet, 248 Mo. 184; Dingman v. Romine, 141 Mo. 466; Sittig v. Kersting, 223 S. W. 742; McClure v. Lewis, 72 Mo. 314; Mowry v. Norman, 204 Mo. 173; Smith v. Williams, 221 S. W. 360; Ennis v. Burnham, 159 Mo. 494.]

As tending to establish that appellant did not influence Mrs. Brown to make the deed to him there was the testimony of four witnesses to the effect that Mrs. Brown had frequently said that ''if Mr. Higgins stayed with her and done as well as he had done, he would get the farm.'' W. H. Miller, who witnessed the deed to appellant, also testified on behalf of appellant as follows:

''Q. Were you in the office when this old lady was brought in? A. Yes, sir.

''Q. How was she brought in? A. She was carried in by a young man.

''Q. Do you know this young man? A. I know him when I see him, yes.

''Q. Were you present and did you hear the conversation had with the old lady at the time the deed was made? A. Yes, sir.

"Q. State as near as you can recollect what was said by her at the time. A. She said she wanted to deed this property to this young man. He had been good to her and kind to her and she wanted to do that much for him. He had looked after her and was going to look after her for the rest of her days. It was something to that effect."

To combat this evidence there was the testimony of Miss Currey, the nurse, who had attended Mrs. Brown at her home, as follows:

"Q. I will ask you to state whether or not you ever saw Mr. Higgins and Mrs. Brown—whether they held conversations about the house there. Did they hold conversations about the house? A. Yes, sir; they held conversations, but they went into another room and shut the door. I heard nothing.

"Q. Who shut the door? A. Mr. Higgins.

"Q. State whether or not after these conversations took place, whether Mrs. Brown said anything to you about what the subject of the conversation was she held with Mr. Higgins? A. She called him 'Willie.'

"Q. Referring to Mr. Higgins? A. Yes, sir; that is his name. Willie was constantly after her to give her home and place to him; deed it to him, and she says, 'I will not do it. He is constantly after me to do it, and he will leave me unless I sign this deed over.'

"Q. How often did Mrs. Brown make those statements to you, Miss Currey? A. It was very often she made those statements; I can't count the times, because, as I said, she was weak-minded and he was gone so much and left the work it agitated her to some extent. She was very worried with him all the time, because we had to constantly find someone to look after the stock and care for the stock.

"Q. When she would make those statements to you about him wanting her to leave the premises to him, state whether or not it was after they had had these private conferences behind closed doors? A. Yes, sir; it was.

"Q.  That was very often?  A.  Yes, sir.

"Q.  What was the mental condition of Mrs. Brown during this particular period that you were staying there and when this conversation occurred?  A.  Her mental condition seemed to be always the same.

"Q.  What was that?  A.  She was suffering such acute pain all the time.

"Q.  Was she strong or weak-minded?  A.  Her mind wasn't strong.  She was what I call a very weak-minded woman.  She was hard to please at times.  .  .

"Q.  I will ask you whether or not you ever heard Mr. Higgins threaten to leave there or any conversation relative to him leaving there unless Mrs. Brown did as he wanted her to do?  A.  Well, Willie told me if— 'Auntie' is what he called her—He said, 'Auntie has promised to deed her place to me and if she don't sign up I will not stay.'

"Q.  Was that more than once?  A.  Yes, that was more than once."

To be considered in connection with the question confronting us, there was also the testimony for respondents as to the infirm physical condition of Mrs. Brown, her intense suffering from pain, and her resultant weakened mentality, between December, 1916, and the time the deed was executed, as hereinbefore adverted to.

In passing upon the question of undue influence, as was said in Dingman v. Romine, 141 Mo. l. c. 474, 475, "the relationship of the parties to each other, the mental condition of the person whose act is in question, and the character of the transaction, should be taken into consideration.  If the relation of confidence and trust between the parties to the transaction exists; if the mind of the one nominally acting is weak and susceptible, and if the transaction results beneficially to the person charged, and detrimentally to the person in whose name the act was done, a presumption of undue influence is raised, and the burden is placed on the one claiming the benefit of the transaction to prove that the act was voluntary and no unfairness was used.  Indeed, the

presence of the relation of confidence and trust alone is generally sufficient to raise a presumption of undue influence.'' And the undue influence need not be proven by direct or positive testimony, but it is sufficient if it is shown by, or can be inferred from, the facts and circumstances in evidence. [Mowry v. Norman, 204 Mo. l. c. 193.] Nor is it required that the influence be exerted at the particular time of the execution of the instrument attacked, but it is sufficient if it be shown that the influence had been acquired previously and operated at the time of the making of the document. [Mowry v. Norman, supra.]

Applying these principles to the case at bar, we find an enfeebled old lady, seventy-five years of age, helpless and depending upon appellant, who was young and vigorous, for care and attention. They had lived under the same roof for over three years in close relationship. Her mind and will, by reason of long suffering and age, were unequal in strength to appellant's, leaving an inviting field for undue influence. Fearful of having no one to care for her during the last few years of her life, she deeded appellant her farm, upon condition that he live with her, keep and care for her during the remainder of her life, this condition being the only real consideration for the conveyance. From the evidence introduced by plaintiffs it appears that appellant was continually after the old lady to deed him the place, threatening to leave her unless she did so. True, this was in a measure rebutted by testimony for appellant to the effect that she had previously expressed the intention of deeding him the place if he continued to remain with her and do as well as he had done, and that the deed, when executed, was signed voluntarily as a reward for appellant's good treatment of her in the past and his agreement to care for her in the future. However, when we consider all the evidence in the case—the fact that appellant himself carried Mrs. Brown up to the office of the attorney who drew the deed; that she then had approximately $6,000 in cash, or sufficient to have supported her

for several years; that appellant subsequently received approximately $4,000 of this $6,000 as a gift, leaving her with nothing but a bare agreement to keep and care for her during the remainder of her life, no part of which agreement appears to have been carried out; that by these operations appellant received practically all of the estate left by Richard Brown and the remaindermen under his will were cut out, we are forced to the con- clusion that the deed in question was procured, either directly or indirectly, through the undue influence of ap- pellant. [Martin v. Baker, 135 Mo. 495; Ennis v. Burn- ham, 159 Mo. 494; McClure v. Lewis, 72 Mo. 314; Ding- man v. Romine, 141 Mo. 466; Cadwallader v. West, 48 Mo. 483; Price v. Meade, 207 S. W. 695.]  This being true, and being sufficiently decisive to vitiate the deed to appellant, it is unnecessary for us to consider the further questions of adequacy of consideration for the convey- ance and mental capacity of Mrs. Brown to make the deed, presented by appellant.

V.  Appellant finally urges that the court erred in limiting the testimony of appellant, individually, to matters and things occurring subsequent to the appoint- ment of the administrator of the estate of Harriett Brown, deceased, and cites the case of Griffin v. Nicholas, 224 Mo. l. c. 288, 289, in support of such contention.  In this we are unable to agree.  Section 4652, Revised Statutes of 1899 (Sec. 5410, R. S. 1919), upon which the ruling in Griffin v. Nicholas, supra, was based, provides, *inter alia,* that "in actions where one of the original parties to the con- tract or cause of action in issue and on trial is dead, or is shown to the court to be insane, the other party to such contract or cause of action shall not be admitted to testify either in his own favor or in favor of any party to the action claiming under him."  In that case the con- tract under consideration, which had been executed by a person then deceased, was held not to be in issue, nor the cause of action.  The plaintiffs therein were not ask-

*Witness:*
*Competency.*

ing to have the same enforced or performed. The real controversy was over a deed executed by the deceased in pursuance of the contract. Such being the case, the court held that defendants, who were parties to the contract, were not disqualified as witnesses to prove the contract, which was held to be "a mere inducement or circumstance leading up to the deed." Here, however, there is the distinction that the deed under consideration is the actual matter in issue and as to which there must be a finding. Therefore, the deed being the subject of the cause of action, Mrs. Brown the grantor being dead, and appellant being "the other party" to the cause of action within the meaning of the statute, we are of the opinion that the trial court committed no error in limiting the testimony of appellant to transactions occurring subsequent to the appointment of the administrator of Mrs. Brown's estate. [Chapman v. Dougherty, 87 Mo. 617; Leeper v. Taylor, 111 Mo. 312; Weiermueller v. Scullin, 203 Mo. 466; Smith v. Smith, 201 Mo. 533, l. c. 547; Goodale v. Evans, 263 Mo. 219, l. c. 229.]

After fully reviewing the entire record, and after having given the usual deference to the conclusions of the trial chancellor, who had a better opportunity to judge as to the credibility of the witnesses and the weight to be given their evidence, we see no good reason to interfere with the result reached. The judgment is accordingly affirmed.

All concur; *James T. Blair, C. J.,* and *Walker, J.,* in paragraphs 4 and 5 and the result; and *David E. Blair, J.,* in paragraphs 1, 4, and 5 and the result.