RUSH GENT, Plaintiff-Respondent, v. DELTA THOMAS and GLENN THOMAS, Defendants-Appellants, and W. E. AUSTIN, Executor of the Estate of CORRA THOMPSON, Deceased, B. F. THOMPSON, PERRY THOMPSON, PIERCE THOMPSON, A. A. THOMPSON, EMMITT THOMPSON, NORA FULLER, EZRA FLETCHER, NORA ELLEN TOPEL, BESSIE STITES, GUSSIE HOLESAPPLE, INA MAE THOMPSON, REV. JAMES THOMPSON, CHESTER THOMPSON, JR., VIRGINIA M. GEORGE, and DELORIS THOMPSON, Defendants, No. 42807—252 S. W. (2d) 345.

Division One, October 13, 1952.

Motion for Rehearing or to Transfer to Banc Overruled, November 10, 1952.

*Herbert S. Brown* and *Robert B. Loman* for appellants.

*L. A. Warden* and *Charles J. Hoover* for respondents.

COIL, C.—The essential controversy on this appeal is between appellant Delta Thomas and respondent Rush Gent and primarily involves the construction of the will of Ezra Thompson. Several suits, some at law and others in equity, filed by one or the other of the parties, were consolidated by the trial court at various times prior

to or at the conclusion of the trial. Inasmuch as the parties have waived any objections they may have had to the consolidation of the cases necessary to a determination of the questions on this appeal, we shall not review the various suits and trace them to the status of each at the time of judgment. The view we take makes it necessary only to make clear that the judgment and decree of the trial court determined the question of the validity of a certain deed executed by Corra Thompson which purported to convey to appellant Delta Thomas title to real estate and determined title to that property. The parties agree that the case was tried in equity and that our review is de novo.

Ezra Thompson and his wife, Corra, had been married 30 years. They had no children. They lived on a farm in Grundy County, containing 88.88 acres, title to which was in Ezra. He died testate in June 1944, survived by Corra. Following a provision for payment of debts and funeral expenses and preceding a clause appointing Corra as executrix, his will was:

"SECOND: After the payment of my just debts and funeral expenses as above provided, I will, devise and bequest to my beloved wife, Corra Thompson, all my property of every kind and description, real, personal and mixed, and wheresoever located, to hold and enjoy during the term of 'her natural life, and at her death, whatever shall remain thereof shall go to and become the absolute property of my nephew, Rush Gent, his heirs and assigns, forever.

"THIRD: This residuary grant to my nephew, the said Rush Gent, is upon the express condition that he render to my wife, the said Corra Thompson, any and every care and attention she may desire, or require from and after my death and during her last years, as fully and considerately as he would or could do if she were his own mother."

In the inventory the farm was appraised at $2,200 and personalty at $3,755.24. Corra duly administered the estate and was finally discharged in August 1945. In December 1947 she purchased a small house in Trenton. On June 4, 1949, she executed a warranty deed to appellant Delta Thomas, by which she purported to convey fee simple title to the farm and the town property, reserving to herself a life estate, the consideration recited being: "in consideration of Delta Thomas caring for Corra Thompson, * * * and agreeing to do so in the future, and for One Dollar and other valuable considerations". On the same day a contract between Delta Thomas and Corra Thompson was executed in which Delta agreed to continue to render care and attention to Corra for the remainder of Corra's life. Corra died February 17, 1950.

The trial court set aside the deed and contract on the ground that "it would be inequitable" to do otherwise, determined that respondent Rush Gent had fee simple title to the real estate in question, and entered a net judgment of $2,000 in favor of appellant Delta Thomas to be a lien upon both the farm and the town property.

Whether the trial court correctly ruled depends in the first instance upon a construction [347] of the will of Ezra Thompson and particularly item ''Second'' thereof, to determine the estate which Corra took under the will. In construing the language used, we attempt to determine the intention of the testator.

Ezra and Corra moved from Missouri to Virginia in about 1932. During their stay there, respondent Rush Gent, Corra's nephew, went to live with them and returned with them to Missouri in 1941 where the three occupied the farm now in controversy until Ezra's death. It was established that Rush was a good worker and performed the usual duties that a boy his age would perform on a farm; and that the relationship between him and the Thompsons was much like that usually existing between child and parents. All the evidence indicates that the three were most congenial. Apparently the prospect of Rush's entry into military service and Ezra's poor health resulted in Paris Gent, Corra's brother and Rush's uncle moving to the farm and assisting in its operation for about 30 or 60 days prior to Ezra's death, and thereafter until Paris's death in October 1947. Corra had been ill and in poor health before Ezra's death.

Turning again to the second item of the will, it is clear that it gave to Corra a life estate in the real and personal property. The question is whether the language used also conferred upon Corra the power to dispose of the corpus and, if so, for what purposes and upon what conditions might she validly exercise this power. Certainly, no power of disposition is given by any express language of the will. But it seems reasonable to say that the words used by the testator, ''and at her death, whatever shall remain thereof shall go to and become the absolute property of my nephew, Rush Gent,'' was language by which testator intended to give to his widow power to entrench upon and consume the corpus of the estate if necessary for her personal use and support.

Testator intended that his widow be provided for during her lifetime. The expression, ''whatever shall remain thereof'', demonstrates that he contemplated that his widow might need to consume the corpus for her own care and support. It was only that part of the real and personal property which remained unused by Corra which testator intended should become the absolute property of Rush Gent.

But expressions such as the one here used: ''Whatever shall remain thereof'', do not imply a power of *absolute disposition* in the devisee of the life estate; they may imply a power to entrench upon and consume the corpus only for personal use and support. Palmisciano v. Staltari, Mo. Sup., 175 S.W. 2d 793, 794[1], and cases there cited. Under such an implied power, any sale or transfer involved in the consumption of the corpus must be made in good faith and for value, and the benefits therefrom confined to the personal use and support of the devisee of the life estate. Such an implied power may not be used

as a device to thwart the purpose of the testator by destroying the devise over to the remainderman. Palmisciano v. Staltari, supra, 175 S.W. 2d 795[3].

It is our conclusion that clause ''Second'' of the will gave to Corra a life estate in the real and personal property with power to entrench upon and consume the corpus for her personal care and support and, if necessary for such purpose, to dispose of the fee in real property. Burnet v. Burnet, 244 Mo. 491, 148 S.W. 872. This implied power, however, could not be validly exercised until the contingency or condition arose or existed upon which the implied power to consume and dispose was made dependent. Citizens' Bank v. Foglesong, 326 Mo. 581, 588-589, 31 S.W. 2d 778, 781.

■ To determine whether the deed from Corra to appellant Delta was a valid exercise of this implied power, we examine the evidence to determine whether the conveyance was reasonably necessary for the personal care and support of the devisee of the life estate. Citizens' Bank v. Foglesong, supra; Cook v. Higgins, 290 Mo. 402, 419-422, 235 S.W. 807, 811, 812.

The facts which must determine this issue are essentially undisputed. After Ezra's death, Corra remained on the farm. [348] As noted, her brother, Paris, had moved there, and Rush remained until he entered military service in March 1945. (Rush was separated from service in September 1946, but did not return permanently to Missouri.) Corra continued to live on the farm with her brother until October 1947 when she sold most of the farm personalty, including some of the personal property inventoried in the estate of Ezra Thompson. Her share from the sale was about $2,200. (A portion of the sale proceeds went to Paris Gent's estate, he having died on the day of the sale.) After the sale, Corra resided temporarily with a nephew and niece near Milan; then with another niece in Trenton. In December 1947, she purchased the house and lot in Trenton. Before she moved into this property, she was confined in a hospital for a short time. She returned to the home of her Trenton niece. A short time later she sent a wire to her sister, Delta, who then lived in Tennessee with her husband and one son, requesting her sister to come to Missouri and providing funds for the trip. Delta arrived in Trenton on January 12, 1948, and immediately thereafter moved with Corra to the house which Corra had purchased the preceding December. Delta's son arrived shortly thereafter and lived in the house with his mother and Corra. During the year March 1948 to March 1949, Corra leased the farm to a tenant. On March 1, 1949, Corra and Delta and Delta's son moved to the farm. In May 1949 they were joined there by Delta's husband and, at some time later, by another son of Delta who, at least part of the time, farmed the land in question under some arrangement with Corra. As heretofore noted, the deed and contract were

executed in June 1949. Delta and her family continued to live on the farm with Corra until her death in February 1950.

We need not detail either Corra's physical condition from the time Delta arrived to care for her, or the type and nature of the services Delta rendered to her sister. Suffice to say that the record abundantly establishes that Corra, between the time of Delta's arrival and Corra's death, was in such physical condition as to require the personal services of someone who would act as housekeeper, cook, and practical nurse, and that Delta rendered these services in a most efficient and devoted manner; that these services were extremely burdensome and involved much in the nature of personal ministration to Corra: and that Corra was bedfast much of the time. She was under the care of her physician during the entire period and, while there is no medical testimony describing the exact nature of her illness, her ailments included "kidney trouble" and diabetes. It further appears that Delta was about 58 years of age and Corra in her early 60's in 1949 at the time the deed and contract were executed.

As mentioned, the assets listed in the inventory of Ezra's estate consisted of real estate (the 88.88 acres) valued at $2,200, and personalty, including $687.24 cash; farm equipment, livestock and a Dodge truck valued at $768.00; and houshold furniture and effects valued at $100. The final settlement in the Ezra Thompson estate filed by Corra as executrix showed that she received from that estate $1,112.36 in cash and some of the farm equipment and livestock which had been theretofore listed in the inventory.

She opened a bank account in August 1945, apparently with the cash received from her husband's estate as the initial deposit. The ledger sheets reflecting deposits in and withdrawals from her account show that there were deposits in 1945, including cash received from her husband's estate, of $1,407.95; in 1946, $1,149.19; in 1947, $1,504.17 not including the proceeds of the sale at the farm which was also deposited (of which $2,198.94 was her share and $1,277.93 went to the estate of Paris Gent); in 1948, $1,559.01; in 1949, $463.72; in 1950 no deposits. On June 4, 1949, the balance in the checking account was $762.79. At her death, the inventory in her estate listed as assets $154.84 in her checking account, $1,031.66 in a savings account and a U. S. Savings Bond of the then value of $21.00, or total assets of $1,207.50. It is not shown when the savings account was opened, but apparently it did not exist until after Ezra's death. The only [349] testimony concerning this account was to the effect that Corra desired to retain it for the payment of her own funeral expenses.

The only reasonable inference is that the only sources of Corra's income between June 1949 and her death were the farm and the town property. She had leased the farm during the year March 1, 1948 to March 1, 1949, and she received rent on the town property from

March 1949 until her death in February 1950. From the farm lease, she received about $620 for the year. She received as rent from the town property an average of $22.50 per month.

Evidence as to the value of the farm in 1949 varied from $50 to $100 an acre. A fair conclusion from the evidence of value is that the farm was worth about $75 per acre in 1949, or a total of about $6,700. There was no evidence as the value of the town property other than that it was rented in March 1949 at an average rental of $22.50 per month. Based on this rental, and noting that in November 1947 (about the time of the purchase of the town property), there was an expenditure of $2,800 from Corra's checking account, the evidence justifies the conclusion that the town property was worth about $2,500 in 1949.

There was evidence to the effect that Delta's services were reasonably worth $1.00 per hour or $50 per week based on wages paid practical nurses in the vicinity when on special cases. There was other evidence that somewhat comparable services were worth about $90 per month and board and room. The monetary value of these services is important to us only in attempting to reconstruct as nearly as we may the financial picture as it must have appeared to Corra when she executed the deed and contract.

Based upon the evidence reviewed, Corra's financial outlook was about this if she lived in the town property and rented the farm on shares: with a lease similar to the one made in 1948-49, she could contemplate an income from the farm of about $620 per year. She would need a combination housekeeper, cook and nurse, which she could not reasonably expect to obtain for any less than $90 per month in addition to board and room for the nurse. Her living expenses, including food, clothing, repairs on the house, medical expenses, and other miscellaneous items, would certainly exceed $75 per month. She knew that her expenses would be at least $165 per month or about $2,000 per year. If she assumed that her income from the farm would continue through her remaining years at about $620 per year, she faced the prospect of her annual necessary expenses exceeding her annual income by about $1,400. If she sold the farm and realized $6,700 from it, and sold her town property and realized about $2,500 from it, she would have $9,200 for her care and support over an undetermined life span. With her minimum expenses of about $2,000 per year, she knew that she would consume the corpus in about 4½ years.

As heretofore noted, there is no medical testimony as to the exact nature of Corra's illness, but the evidence does not justify an inference that, because of her state of health, she would know or reasonably expect that she would continue to live only a short time. And there is nothing to indicate any basis for determining how many years she would, or thought she would, continue to live and need the care and

attention which Delta had rendered her since January 1948 and would agree to render for her remaining days.

Furthermore, we may not overlook the fact that there was no evidence that the kind of services Delta rendered to her sister could have been obtained elsewhere at any price. This was a matter which Corra, in all reasonable probability, must have taken into account in attempting to plan for her own future care and support.

Now in determining whether the condition or contingency had arisen which permitted Corra to consume the corpus by disposing of the fee in the realty, we must consider the particular facts of this case and apply a yardstick which under these facts is appropriate. The test is whether the evidence shows that the conveyance was, under the circumstances, reasonably necessary for the personal use and support [350] of Corra. Citizens' Bank v. Foglesong, supra; Cook v. Higgins, supra. The question of whether a state of facts existed making the conveyance "reasonably necessary" is a matter for judicial determination. Cook v. Higgins, supra. And in making that determination, we decide whether the funds or benefits derived from the conveyance were reasonably necessary for the personal use and support of the life beneficiary.

We have no difficulty in reaching the conclusion from the evidence in this case that the conveyance by Corra Thompson to Delta Thomas was reasonably necessary for the personal care and support of Corra during the remainder of her life as she reasonably contemplated the facts in June 1949 at the time of the conveyance. In this connection, it should be made clear that there was no contention below, and there is no contention here, that Corra was in any way lacking in mental capacity, or that any person or persons exercised any undue influence upon her in bringing about the conveyance and contract in question. The record shows without dispute that Delta fully performed the contract by which she agreed to render care and attention to Corra until Corra's death.

We conclude and hold that the trial court erred in setting aside the deed and contract and that the warranty deed from Corra to Delta was a valid conveyance of the fee simple title to the real estate described in the deed. This view makes it unnecessary to consider the further contentions of the parties on this appeal.

Respondent, in urging that the trial court correctly set aside the deed and contract as inequitable, points to this evidence: That shortly after Delta arrived in Trenton and moved to the town property with Corra, she was joined by her son who lived with Corra and Delta and attended school; that in March 1949 Delta's husband, appellant Glenn Thomas, joined Corra and Delta and Delta's son; that thereafter, about April 1, 1949, another of Delta's sons, then about 26 years of age, also moved to Corra's farm; that about July 1 Corra gave Glenn,

Jr., (the 26-year-old son) the sum of $500. Respondent urges that this testimony indicates that the entire Thomas family was in effect being supported by Corra. It is our view that these facts would become significant only if it were disclosed in evidence that, by reason of the presence of the other members of Delta's family, Corra wasted assets accruing from her life estate which would otherwise have been available for her own support. In other words, these facts are relevant on the question of whether Corra's conveyance to Delta became "reasonably necessary" only because of the presence of the other members of the Thomas family. The evidence does not so show and we cannot reasonably draw any such inference. The only direct evidence is to the effect that Delta's husband assisted her in the care of Corra and also assisted in the operation of the farm; that the 26-year-old son actually operated the farm and received the $500 under some arrangement with Corra (a portion of which he spent in farm operation); that the younger boy assisted when he was not in school; that the income from the farm from July 1949 to February 1950 went to support all of them. Furthermore, this farm arrangement did not begin until March 1949 and, as we have heretofore pointed out, Corra's financial outlook on June 1, 1949 was such as to make reasonably necessary the conveyance of the fee to Delta. The presence of Delta's husband and the younger son at the farm for the two months of April and May did not change Corra's financial picture by reason of any consumption by the Thomases of a portion of the income from the life estate which otherwise would have been available to Corra. At least we may not so infer from the evidence in this record.

The judgment is reversed and the cause remanded with directions to enter judgment in accordance with the views herein expressed; costs to be assessed one half against appellant, Delta Thomas, and one half against respondent, Rush Gent. The costs of this appeal are assessed one half against appellant, Delta Thomas, and one half against respondent, Rush Gent. [351] *Van Osdol* and *Lozier, CC.,* concur.

PER CURIAM:—The foregoing opinion by COIL, C., is adopted as the opinion of the court. All the judges concur.