Louis J. MORISSEAU, Appellant,

v.

Walter BIESTERFELDT, Individually and as Executor of the Estate of Edward E. Morisseau, Deceased, Paul Biesterfeldt, Administrator c.t.a. d.b.n. of the Estate of Edward E. Morisseau, Deceased, and Mildred Carley, Respondents.

No. 47976.

Supreme Court of Missouri,

Division No. 1.

April 10, 1961.

Dubail, Judge & Kilker, Charles R. Judge, St. Louis, for appellant.

David H. McGhee and Tyree C. Derrick and Derrick & Holderle, of counsel, St. Louis, for respondents.

COIL, Commissioner.

Louis J. Morisseau sought to recover in excess of $11,000 as the proceeds from the sale of assets which he claimed as remainderman under his sister Annette's will upon

the death of the life tenant, Edward Morisseau. Defendants below were as shown in the above caption, but plaintiff now seeks relief against only Paul Biesterfeldt as the administrator c. t. a. d. b. n. of the estate of Edward Morisseau. The trial chancellor dismissed the action at the close of plaintiff's evidence. Plaintiff, who appealed prior to January 1, 1960, contends the trial court erred in so ruling because the evidence established his right to a money judgment.

Annette Morisseau, who died in April 1953, left a will which made her brother Edward the life tenant of all her real and personal property with remainder to her brother Louis. Edward died in June 1958 and Louis survived him. Annette left only personal property which, in so far as concerns any present issue, was: 650 shares of Burroughs Corporation, 650 shares of Nash-Kelvinator Corporation (exchanged for 650 shares of American Motors Company), and 80 shares of Laclede Christy Company. All of that stock was received by life tenant Edward under the St. Louis County Probate Court's order of distribution dated June 1, 1954.

Elmer B. Kline, a stockbroker, visited Edward about the middle of 1954 to attempt to sell him securities. Edward said he could not purchase securities and, in fact, was in poor financial condition and in great need of funds with which to meet his general and living costs, and therefore was interested in selling some stock in order to raise money with which to pay his expenses. Mr. Kline advised Edward that stock prices were then low and advised him not to then sell but to borrow money. Edward had real estate (the parties seem to agree, although the record does not specifically show, that at least some of that real estate came to Edward from his sister Annette shortly before her death). In any event, Mr. Kline arranged a $5,000 loan, the note for which was secured by a mortgage on certain of Edward's real estate. .

The lender was Edward's friend and relative, Walter Biesterfeldt. (It is said in the brief that Edward's will devised that same real estate to Walter Biesterfeldt.) Mr. Biesterfeldt, at Edward's direction, retained $375 from the $5,000 loan representing a year's interest at 5½ per cent, and delivered his check for $4,725, dated December 28, 1954, to Edward. Edward had a savings account in which he deposited that $4,725. The balance in the savings account immediately prior to that deposit was $1,699.06. On June 3, 1955, Mr. Kline sold for Edward's account 400 shares of the American Motors stock for $4,256.25 (apparently net to the seller) and remitted that amount to Edward who deposited $3,256.25 in the savings account and deposited the remaining $1,000 in his (Edward's) checking account. On July 7, 1955, Mr. Kline sold 250 shares of American Motors for $2,376.94 and Edward deposited that amount in the savings account. On March 14, 1956, Mr. Kline sold 200 shares of the Burroughs stock for $6,910.61 and Edward deposited $2,300 in the savings account and $2,510.61 in the checking account. The disposition of the remaining $2,100 was not shown. (Plaintiff states that the $2,100 was paid to Edward in cash, but the proof goes no further than to show that $2,100 of the total proceeds was not deposited in either the checking or savings account.) On December 13, 1956, the broker sold 450 rights to purchase Burroughs stock for $180.29 which amount was deposited in the checking account. On June 18, 1957, Edward directed Mr. Kline to sell 100 shares of Burroughs for $4,676.30 for the stated purpose of using the proceeds to apply toward payment of the $5,000 Biesterfeldt loan. Edward endorsed the $4,676.30 check, issued his personal check for $323.70, and delivered both to Mr. Biesterfeldt in payment of the loan.

At the time of Edward's death on June 6, 1958, there was a balance in his savings account of $4,880.63 and a balance in his checking account of $1,341.83. Those amounts were delivered to the executor of Edward's estate and were inventoried as cash belonging to Edward at the time of his death.

There were 350 shares of Burroughs stock remaining unsold at Edward's death which were delivered to plaintiff Louis as Annette's remainderman. There was no evidence as to the disposition of the 80 shares of Laclede Christy stock which were part of the life estate assets delivered to Edward at Annette's death, but there is no present controversy with respect to those shares.

The inventory in Edward's estate disclosed that he died possessed of real estate valued at $20,000, the $6,222.46 cash transferred from the savings and checking accounts as noted, other cash in the sum of $13.80, and goods and chattels valued at $832.

The initial question involves the construction of the language of Annette's will which created Edward's life estate. That language (for clarity, stated so as to show its direct application to Edward) was:

All of my estate, whether real, personal or mixed property, and wheresoever situated, I give, bequeath and devise unto my brother, Edward E. Morisseau, to have and to hold the same for and during his natural life with the right and power in him to sell, lease, pledge, hypothecate, invest and reinvest all or any part thereof, and to use, employ or dispose of the same, whether corpus or income, as he may deem necessary for his proper support and maintenance.

Plaintiff's contention is that Annette's will gave Edward the power to consume all or part of the corpus only in the event that it became reasonably necessary for him to do so in order to properly support and maintain himself, and inasmuch as the evidence showed that he had not first used and consumed his own separate assets, no reasonable necessity to use the life estate corpus could have existed. We do not agree.

The testatrix, by the language of her will set forth above, did not make Edward's

power to consume the corpus dependent upon the existence of a fact, i. e., the existence of a reasonably demonstrated necessity, but, on the contrary, Annette specifically made Edward's power to consume all or part of the corpus dependent upon his own personal opinion or conclusion that the consumption of all or part of the corpus was necessary for his proper support and maintenance. See the dissenting opinion in Griffin v. Nicholas, 224 Mo. 275, 123 S.W. 1063, 1082, for an analysis of the present question; that portion of that dissenting opinion was later adopted by the court en banc in Cook v. Higgins, 290 Mo. 402, 235 S.W. 807, 812.

The language in Annette's will should be distinguished from language such as or similar to that in Citizen's Bank of Lancaster v. Foglesong, 326 Mo. 581, 31 S.W.2d 778, 779, 781, where the testator devised real and personal property "to my beloved wife Della M. Foglesong to have and enjoy during the term of her natural life with full power and authority to dispose of such part or all of same as may be necessary for her support and the support of the children mentioned in the next paragraph.

"3rd. Any part of my estate remaining at the death of my wife, I will and bequeath to my children, * * *."

That language, unlike the language in the present case, made the widow's power of disposal contingent upon the existence of a reasonable necessity to expend part or all of the corpus for the widow's and her children's support.

It is unnecessary that we go further in this case and determine the limitations upon the exercise of Edward's discretion in "deeming" the use of part of the life estate corpus necessary for his proper support. It is sufficient to point out that plaintiff failed to adduce any evidence tending to show the circumstances under which Edward consumed part of the corpus of the life estate. Thus, there was no evidence that the life tenant consumed any portion of the life

estate corpus which he reasonably did not "deem necessary" for his proper support and maintenance.

We do not mean by our ruling herein to indicate that even in those situations where the testator's language by direction or implication makes the exercise of the life tenant's power to consume the corpus dependent upon the existence of a reasonable necessity that the life tenant must have become destitute before any reasonable necessity could exist. See Gent v. Thomas, 363 Mo. 528, 252 S.W.2d 345, 347 [1] [2, 3]. The intention of the testator governs in every case, and the variations in language, circumstances and the nature and extent of the property involved, eliminate the desirability of attempting to state a general rule.

What we have said heretofore disposes also of plaintiff's further contention that Edward's use of the proceeds from the sale of life estate assets to pay the $5,000 Biesterfeldt loan (secured by a mortgage on Edward's real estate) was wrongful in that it did "not constitute 'proper support and maintenance' but fraudulently increased the value of Edward's devise to Biesterfeldt by misuse of life estate assets." The brief but decisive answer to that contention is that inasmuch as we have held that under the terms of Annette's will Edward had the power to consume all or part of the corpus of the life estate if he deemed it necessary for his proper support, and inasmuch as the evidence failed to show that any life estate assets were consumed which the life tenant reasonably did not deem necessary for his proper support, it follows that the payment out of life estate assets of a loan theretofore made for the purpose of supporting and maintaining the life tenant until such time as the shares of stock in the life estate might be more advantageously sold, was a proper use of the life estate corpus; or, at the very least, upon this record, such use was not shown to have been improper.

Plaintiff's evidence did show, however, that a part of the money in Edward's savings account at the time of his death was the unused proceeds of the sale of life estate assets. The record evidence (a sheet from the bank's "savings ledger") showed that immediately prior to the first deposit in the savings account of the proceeds of the sale of life estate stock, the balance in Edward's savings account was $1,699.06; that thereafter and until the time of Edward's death the total deposits in his savings account from *all* sources totaled $14,381.57; thus the total deposits from all sources in the savings account plus the $1,699.06 on hand when those deposits began totaled $16,080.-63. The evidence showed that the total deposits in the savings account of the proceeds of the sale of life estate assets totaled $12,-658.19; thus, deducting that amount from the total of $16,080.63 demonstrates that the amount in the savings account from sources other than the sale of life estate assets was $3,422.44. As noted, there was a balance on hand in the savings account of $4,880.63 at the time of Edward's death; thus, deducting therefrom the total amount in the savings account from sources other than the sale of life estate assets, viz., $3,422.44, leaves $1,458.19, which, of course, had to be money from the sale of life estate assets which was not used or consumed by the life tenant.

Plaintiff's amended petition purported to state facts which entitled plaintiff to the equitable relief of an accounting by defendants for money and other property in their hands which had theretofore formed part of Edward's life estate during his lifetime. The petition charged that the life tenant attempted to defeat the rights of plaintiff as remainderman by creating joint tenancies in certain of the life estate property by wrongfully disposing of life estate assets by transferring or giving away money received from the sale of life estate assets to Walter Biesterfeldt, and by disposing of life estate assets by his (Edward's) will.

The administrator contends that in the trial court this was a suit in equity for an accounting; that the case was tried there on

that theory; that plaintiff has abandoned that theory and now seeks only a money judgment against the administrator c. t. a. d. b. n. "as if it were an action at law for money had and received." Thus, says the administrator, inasmuch as plaintiff's evidence failed to prove any allegation of his petition or to show that he was entitled to an accounting as prayed or to any other equitable relief, the trial court correctly entered a judgment of dismissal.

■　The record indicates clearly enough that the trial chancellor and both parties understood that at least one of the questions at the trial was whether the funds shown to have been in Edward's savings and checking accounts at the time of his death were part of the proceeds of life estate assets which had been unconsumed during his lifetime. It is true, however, as defendant administrator contends, that plaintiff failed to prove any specific averment contained in his petition in equity, and it is also true that plaintiff's evidence showed that the only relief to which he was entitled was a money judgment against the administrator for $1,458.19 which belonged to plaintiff as remainderman under Annette's will. Under those circumstances, i. e., where the trial evidence disclosed plaintiff was not entitled to equitable relief, the equity court did not have jurisdiction to have entered a judgment determining his rights at law. Dyer v. Union Elec. Co., Mo.App., 318 S.W.2d 401, 405 [9]; Krummenacher v. Western Auto Supply Co., 358 Mo. 757, 217 S.W.2d 473, 475 [1]. And see Woolley v. Dorl, Mo.App., 68 S.W.2d 869, 871.

Furthermore, we may not on this record consider the case here as though it had been tried below as a jury-waived case by agreement of the parties. The record shows that the defendant administrator insisted at the close of plaintiff's opening statement that the action be dismissed on the ground that plaintiff's action, if any, was at law and not in equity.

■　But, as heretofore noted, the evidence does show unmistakably that defendant administrator has in his possession $1,458.19 which belongs to plaintiff as remainderman. Indeed, the evidence, in large part, which tended to establish the facts on which plaintiff's money judgment would be based, consisted of bank records which defendant administrator not only did not dispute but, by his use of those records at the trial, indicated that he, tacitly at least, conceded their accuracy; and while there was a fact question, as opposed to the conclusion to be drawn from undisputed facts, with respect to plaintiff's evidence which tended to prove that the proceeds of the various stock sales were in fact deposited in Edward's savings or checking account, the evidence in the record seems entirely clear that the stock sales proceeds were deposited in the accounts at the times and in the amounts stated in the fore part of this opinion; and on the whole record it appears that defendant did not seriously contend to the contrary.

For the reasons indicated we may not upon this record enter nor direct the trial court to enter a money judgment. We are of the view, however, that the judgment of dismissal should be reversed and the case remanded to give plaintiff an opportunity to amend his petition and proceed at law against defendant Paul Biesterfeldt as the administrator c. t. a. d. b. n. of the estate of Edward E. Morisseau. Welborn v. Rigdon, Mo., 231 S.W.2d 127, 134 [14, 15]; Krummenacher v. Western Auto Supply Co., supra, 217 S.W.2d 475 [4, 5].

It is so ordered.

HOLMAN and HOUSER, CC., concur.

PER CURIAM.

The foregoing opinion by COIL, C., is adopted as the opinion of the court.

All concur.